ESTATE OF MARGUERITE M. GREEN, DECEASED, AND VIRGINIA G. PAUL AND FRANCIS W. GREEN, JR., CO-EXECUTORS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3274-74.    Filed September 17, 1975.

*Kenneth G. Anderson* and *Robert S. Bolt,* for the petitioners.
*Thomas M. Cryan,* for the respondent.

RAUM, *Judge:* The Commissioner determined a deficiency in decedent's Federal estate tax in the amount of $304,482.07. Both parties have made certain concessions, and the principal issues remaining for decision are the following:

(1) Did decedent, in respect of property which she transferred in trust, retain an interest therein which would require the inclusion of its value in her gross estate pursuant to section 2036(a)(1), I.R.C. 1954?

1050

The parties have filed a stipulation of facts which, together with the accompanying exhibits, is incorporated herein by this reference.

Marguerite M. Green (decedent) died testate on October 22, 1971, at Palm Beach, Fla. She was born on February 9, 1889. Virginia Green Paul, decedent's daughter, and Francis W. Green, Jr., decedent's son, were, respectively, executrix and executor of decedent's will. At the time of filing the petition herein Virginia resided in Palm Beach, Fla.; Francis, Jr., resided in Darien, Conn.

Decedent's husband died in 1963. Sometime thereafter, in 1965 or 1966, she moved her residence from Bay Shore, Long Island, New York, to Palm Beach, Fla., where her daughter, Virginia Paul, and Virginia's husband, John Paul, already resided. For some years prior thereto decedent had from time to time sojourned in Palm Beach. John Paul was an attorney and had practiced law in Palm Beach since about 1940.

1. *The trust property.*—Under date of December 6, 1966, decedent, who was then 77 years old, and the First National Bank in Palm Beach (the bank) executed a document entitled "Trust Agreement" which had been prepared for decedent by John Paul's law firm pursuant to his discussions with her. She had had a checking account at that bank ",off and on" for a number of years. By virtue of the Trust Agreement, decedent created an irrevocable trust, the bank being trustee, to which she transferred shares of stock in some seven or eight publicly held corporations. These securities had an aggregate fair market value of approximately $712,100, and constituted the great bulk of her wealth. Her remaining assets (some of them income producing) then amounted to about $125,000 and consisted primarily of several bank accounts and other liquid assets plus some personal property such as jewelry and household furnishings. She also had rights to social security benefits and medicare benefits which covered approximately 80 percent of her medical expenses. The principal block of stock among the securities transferred consisted of 7,944 shares of Avon Products, Inc., which had a then fair market value of about $685,485. The creation of the trust was prompted, in part at least, by the difficulties that the decedent was experiencing in keeping her financial affairs in an orderly fashion, due to her poor eyesight and her frequent travels.

The Trust Agreement provided in part as follows:

2. The Trustee shall advance to the Grantor from the corpus of this Trust the sum of FIFTY THOUSAND DOLLARS ($50,000), to be used by the Grantor for the purchase of a home for herself if she so chooses.

3. The Trustee shall distribute to or for the benefit of the Grantor during her lifetime, so much of the corpus each year which, when added to the net income from the Trust corpus, will equal, but not exceed, the sum of TWENTY-FIVE THOUSAND DOLLARS ($25,000), if, in the discretion of the Trustee, such amount is deemed necessary for the health, welfare and happiness of the Grantor considering any and all income the Grantor may have from other sources.

\* \* \*

6. The Trustee shall have the power to treat as income any property received as or in the nature of a dividend or interest, and any property which it may determine to have been received in lieu of a dividend or interest, including any such property which might otherwise be determined to be principal; and likewise to treat any such property wholly or in any part as principal to any extent it may deem proper and which may be lawful.

The Trust Agreement did not otherwise provide for the distribution of any income or principal during decedent's life. Upon her death, the trustee was directed to pay $15,000 to the Sisters of St. Joseph for St. Joseph's Home, a charitable organization; the balance of the corpus was payable in equal shares to her children, Virginia Paul and Francis Green, Jr., their respective shares being payable to their surviving issue or to their estates in the event either of them predeceased their mother.

The trustee was a national bank which, in addition to its trust business, engaged in commercial banking and other typical banking activities. Neither decedent nor either of her two children were stockholders, directors, or officers of the bank. The bank was near decedent's apartment, and both prior to and after the execution of the Trust Agreement, decedent maintained a checking account at the bank.

Decedent did not deal directly with the bank in connection with the establishment of the trust. After the Trust Agreement had been prepared by John Paul's law firm and read to her by her son, she signed it. At that point neither she, nor her son-in-law, nor her children had had any conversation or other communications with the bank about the trust, its provisions, or its administration; the bank was at that time unaware of the existence of the Trust Agreement, and it had no knowledge of its terms or the corpus.

The bank first became aware of the Trust Agreement when the decedent's son-in-law, acting upon her behalf, took the document to the bank and discussed with the head of the trust department the intended manner in which it was to be carried out, and in particular the arrangements for current distributions to the decedent. Mr. Paul explained that the decedent "lived well but not terribly extravagantly," that their "main concern was that she wouldn't ever be overdrawn at the bank," and that if she "wanted to buy something" funds would be available for that purpose. It was then understood that distributions to the decedent would be made by the bank through her checking account with the bank. The amount to be distributed, discussed by Mr. Paul and agreed to by the head of the trust department, was $6,000 a quarter. Mr. Paul also pointed out that although the trust was "over-heavy" on Avon Products, they were favorably impressed with the company, and notwithstanding its low income yield (which was not sufficient to provide for the contemplated distributions) he indicated his desire that the bank as trustee retain the stock as long as it could do so and fulfill its obligations under the trust.

With this understanding of the intended operation of the trust as explained by Mr. Paul, the Trust Agreement was executed on behalf of the bank at about that time. Thereafter, the trust was assigned for administration to Mr. Charles Penney, a trust officer at the bank, who had responsibility for administering some 230 trusts. He was instructed by the head of the trust department to make distributions to decedent of $6,000 per quarter, and he thereupon "set up" the trust to make such distributions, the first one to be made in March 1967. The bank did not at any time make any independent investigation to determine whether the decedent needed distributions in such amounts. It knew that the income from the trust was not sufficient to pay such amounts, and it accordingly understood that the contemplated distributions would result in the payment to the decedent of all of the trust's net income plus a portion of the corpus.

Decedent filed a Federal gift tax return in April 1967, for the year 1966. On that return, which also was prepared for decedent by John Paul's law firm with John Paul's knowledge and under his supervision, the amount of the taxable gift resulting from the creation of the trust was reduced by $144,427.56, which was identified therein as: "Value of Life Estate retained by Donor as

provided by Par. 3 of Trust Indenture." John Paul himself brought the return to decedent's apartment for her signature, and he thereafter filed it for her. In accordance with paragraph 1 of the Trust Agreement, which required the trustee to pay all relevant gift taxes, the bank paid the Federal gift tax ($85,750) shown to be due on the return. It obtained the funds for that purpose by borrowing $85,750 from its commercial loan department on April 17, 1967, upon the collateral of 1,500 shares of Avon Products stock taken from the trust corpus. The loan was repaid on July 17, 1969, out of the proceeds of sale of 1,000 of those shares of Avon Products.

During the period from December 6, 1966, through October 22, 1971, the date of decedent's death, decedent was the only beneficiary of the Trust Agreement to receive any distributions of either income or principal.

As indicated above, the bank planned to make the first quarterly distribution to the decedent in March 1967. Apparently such arrangement for quarterly distributions was not understood by the decedent, and in February 1967, she inquired of Mr. Penney, the trust officer at the bank in charge of her trust, why she had not yet received any distributions. The quarterly arrangement was explained to her, but as a result of that discussion, the bank began (in March 1967) to make distributions to her on a near monthly basis, generally in the amount of $2,000 a month. The distributions in fact did not exceed a total of $22,000 in any one year, and were as low as $13,520.12 during the first year. The total thus distributed to her over the entire period beginning in 1967 up to the date of her death on October 22, 1971, was substantially in excess of the total net income of the trust for that period.[1] Also, the aggregate amount distributed to her in each of the years 1967-70, inclusive,

---

[1] The net income of the trust was computed by subtracting allocable expenses from the ordinary income of the trust, which consisted exclusively of dividends and interest. However, in each of the years 1967-71, inclusive, the bank sold some of the securities in the trust, and, except for 1968 when it recorded a loss on such sales, the proceeds of the securities sold in each year exceeded their value as of the time when the bank received them. The record does not disclose the basis or the adjusted basis of such securities, nor the amount of taxable capital gains realized upon such sales. However, the trustee on its records did not treat any such capital gains as income of the trust, and they were reflected merely in the principal account. No argument is made here on behalf of petitioner that such gains in this case should be treated as "income" from the transferred property in the application of sec. 2036(a)(1).

exceeded the net income of the trust for such year, and the bank allocated such distributions to both income and principal.

As to the year 1971, the bank made 10 monthly distributions of $2,000 each, the last one on October 15, 7 days prior to decedent's death. For the entire calendar year 1971 the trust received $25,410.80 in dividends and interest ($218.07 thereof after decedent's death), and incurred total expenses of $4,198.13 (allocable in part to income and in part to principal). On its monthly statements for 1971 the bank treated the entire $2,000 distribution for each month, except February, as having been made from income, and as to February, it allocated $1,437.01 to income and $562.99 to principal.

For the years 1967-71, the income of the trust (dividends and interest), the expenses charged against income, the net income available for distribution, and the amounts actually distributed to the decedent, are shown in summary form in the following table:

| | 1967 | 1968 | 1969 | 1970 | 1971 | Total |
|---|---|---|---|---|---|---|
| Dividends and interest received __ | $12,144.54 | $13,035.56 | $14,514.87 | $21,512.38 | $25,410.80 | $86,618.15 |
| Expenses charged against income ___ | 3,155.82 | 5,252.21 | 4,733.90 | 2,495.87 | [1] 1,864.16 | 17,501.96 |
| Income available for distribution ___ | 8,988.72 | 7,783.35 | 9,780.97 | 19,016.51 | [1] 23,546.64 | 69,116.19 |
| Amount distributed to decedent_____ | 13,520.12 | 18,577.53 | 14,000.00 | 22,000.00 | [2] 20,000.00 | 88,097.65 |

[1] The total expenses for the year 1971 were $4,198.13. The $1,864.16 in expenses charged by the trustee against income represented one-half of the trustee's fees ($1,364.16) plus $500 in attorneys' fees. However, the foregoing total 1971 expenses ($4,198.13) included intangible taxes in the amount of $956.30 which the trustee failed to charge against income, in contrast to its established practice of the preceding 4 years when it charged the intangible taxes for each year against the income of the respective year. The record contains no explanation why this practice was not continued for 1971, and if the pattern established for the preceding 4 years were followed in 1971, the total expenses chargeable against income would be $2,820.46 ($1,864.16 plus $956.30), with the consequence that the income available for distribution for the entire year 1971 would be $22,590.34 ($25,410.80 minus $2,820.46).

[2] First 10 months.

During the course of administering the trust the bank sold some portions of the corpus and reinvested the available proceeds. However, in accordance with the wishes originally expressed at the time the trust was established, the bank continued to hold a large amount of Avon Products stock (which had meanwhile had a 2 for 1 split). On October 22, 1971, the date of decedent's death, the corpus of the trust had a fair market value of $1,173,395.70 and consisted of the following items or categories of assets:

| | Value at 10/22/71 |
|---|---|
| 9,200 shares Avon Products, Inc. _____ | $888,950.00 |
| Various municipal bonds_____ | 264,036.25 |
| U.S. Treasury notes _____ | 10,069.50 |
| Cash in bank _____ | 10,339.95 |
| Total_____ | 1,173,395.70 |

In the statutory notice of deficiency the Commissioner determined that decedent "retained the right to the income from $1,123,395.70 [2] of the [trust] property, thus rendering the amount of $1,123,395.70, the value of the property, includable in the gross estate under section 2036 of the Internal Revenue Code."

2. *The joint savings account.*—At some time in 1965, decedent underwent surgery for the removal of a tumor in the vicinity of her stomach. Although the tumor was found to be malignant, the surgeon advised the family that the operation had gone well and that he anticipated no future problem in respect of the removed malignancy. Decedent thereafter resumed an active life, including travel.

In 1965 or 1966 decedent moved to West Palm Beach, Fla., near her daughter and her daughter's family. In February 1967, decedent entered a hospital for surgery to remove cataracts which were interfering with her vision. The operation was not successful in improving her eyesight. She resisted wearing the heavy glasses that were prescribed for her after the operation. Following the operation she also developed glaucoma, and her vision remained very poor throughout the remainder of her life. Due to this condition it was necessary for her daughter, Virginia, to assist decedent with her correspondence and routine financial matters, such as writing checks and withdrawing money from savings accounts. With the exception of the passbook for a joint savings account, discussed below, decedent retained the possession of her passbooks and checkbooks but for those times that Virginia brought them to her own home to work on them. When this occurred, she returned them to her mother shortly thereafter.

Despite decedent's deteriorated vision, though, she continued to lead an active, if not vigorous, life, regularly meeting with

[2] This figure represents the total value of the trust assets at the time of decedent's death less $50,000 of the corpus which, pursuant to par. 2 of the Trust Agreement, decedent retained the right to receive in the event she purchased a house and which the parties now agree is includable in the gross estate as a revocable transfer under sec. 2038.

friends and visiting her family. Among her travels, she made three or four trips a year, unaccompanied, to visit her son and his family in Connecticut as well as in Vermont where he had a second home. Having decided to purchase a residence for herself, she bid on a house in Palm Beach in the spring of 1967. When the house was sold to another bidder, decedent, piqued at not being offered the opportunity of increasing her bid, went by herself for the summer to Charleston, S.C., where she had many friends. While in Charleston, she stayed at a hotel, visited her friends, dined at various restaurants, and shopped for clothes and antiques, which she collected.

On June 29, 1967, while still in Charleston, decedent opened a joint savings account at a savings and loan association in Charleston in the names of "Mrs. Marguerite M. Green or Mrs. Virginia Green Paul," entitling either woman, alone, to withdraw amounts therefrom. As the address, decedent supplied her temporary South Carolina address which she later changed to her Palm Beach, Fla., address. At the time she opened the account, decedent deposited $15,000 of her own funds in the account. Upon her return to Palm Beach in October 1967, decedent placed the passbook in the exclusive possession of Virginia Paul, saying "This is yours, Virginia, keep it." Decedent placed no restriction on Virginia's use of the funds nor was there any agreement between them that Virginia would refrain from withdrawing the deposited funds. Decedent did not give Virginia the passbooks for any of the other savings accounts which she had, one of which was also in the joint names of decedent and Virginia. Decedent's health at the time was thought by all to be good; her only medication was eyedrops.

Interest on the balance in the foregoing Charleston account, denominated as "dividends," was payable semiannually. At least through 1970 decedent received all of the interest from the account and reported it as income on her Federal income tax returns. In 1970 decedent made three additional deposits to the account totaling $2,321.36. Decedent did not file a gift tax return for the year 1967.

After returning to Palm Beach in October 1967, decedent lived in a hotel for about 6 weeks and resumed her search for a house to buy. During that time she was out either with friends or family on most days. She also subscribed to the theater on a yearly basis and attended weekly. Late in 1967 she flew to New York unac-

companied. In early 1968 decedent found a condominium apartment in Palm Beach which she wished to buy. She then asked Virginia if it would be all right for her to withdraw $8,000 from the Charleston joint account to be used as downpayment for the condominium. Virginia thereupon effected the withdrawal for decedent on March 18, 1968. Virginia Paul did not file a gift tax return in respect of this transaction.

Decedent had made gifts to her two children numerous times in the past, consisting both of cash and securities and usually in amounts of $3,000 or less in any one year in respect of the particular donee.

With the exception of a brief stay in the hospital of about a week near the end of 1970, decedent lived in her condominium apartment until sometime in March 1971. While living at home, she did not have need for a nurse, although she did have a woman live with her to perform certain cleaning and cooking chores. In March 1971, decedent was admitted to the hospital for 2 to 3 weeks, after which she went to a nursing home where she remained until she died on October 22, 1971. She was 82 years old when she died. The cause of decedent's death was diagnosed as liposarcoma, a form of cancer. Although she had been unaware of that condition until shortly before her death, it had been present in her body for about 5 years.

On April 26, 1971, shortly after her mother had entered the nursing home, Virginia Paul closed the joint savings account and withdrew the remaining balance of $9,321.36 to help pay for an addition to her summer house. Neither decedent nor her estate filed a Federal gift tax return for 1971. Nor was any gift tax return filed in respect of the Charleston bank account in any other year.

On the Federal estate tax return, the value of the joint savings account was not included in the gross estate, nor was it reported as a transfer within 3 years immediately preceding death.

In the notice of deficiency, the Commissioner determined that Virginia Paul had withdrawn the balance of the joint savings account "in contemplation of death," and that therefore, "the amount of $9,321.36 is includable in the decedent's gross estate under section 2035 of the Internal Revenue Code."

OPINION

1. *The trust property.*—In late 1966 the decedent and the bank entered into a Trust Agreement under which she in fact received until her death in October 1971 periodic payments which in the aggregate were substantially in excess of the net income of the trust. The securities transferred to the bank at the time of the execution of the agreement represented her only contribution to the trust, and the only payments made by the trustee, in addition to the periodic distributions to the decedent, consisted of the expenses of the trust and the gift taxes which became due as a result of the decedent's transfer of the securities to the bank. At issue is whether decedent's interest in the trust assets amounted to such retention of the property as would require its inclusion in her gross estate by reason of Code section 2036(a)(1), the pertinent part of which provides:

SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE.

(a) GENERAL RULE.—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death—

(1) the possession or enjoyment of, or the right to the income from, the property * * *

It is petitioner's position that paragraph 3 of the Trust Agreement vested the trustee merely with discretion to distribute income to decedent, which it did, and that insofar as decedent was concerned this constituted neither a "right to the income" of the trust nor the "possession or enjoyment" of the trust property within the meaning of section 2036(a)(1). The Commissioner responds in twofold fashion. First he argues that the Trust Agreement, when properly construed, gave decedent the right to receive, if not all of the income, at least up to $25,000 of income a year. Alternatively, he contends that at the time decedent executed the Trust Agreement there was a contemporaneous understanding, unstated in the document, under which the bank would distribute the income to decedent, and decedent thereby retained the "enjoyment" of the trust property as contemplated by section 2036(a)(1).

The conditions under which section 2036(a)(1) becomes applicable are stated alternatively, not cumulatively. It is sufficient for the applicability of section 2036(a)(1) that the decedent has retained either the "right to the income" from the transferred property or the "possession or enjoyment" thereof. Thus, even though the decedent may not have reserved the "right" to the income, the transfer may nevertheless fall within section 2036(a)(1) if she retained the actual "possession or enjoyment" of the trust assets. *McNichol's Estate v. Commissioner*, 265 F. 2d 667, 670-671 (3d Cir.), affirming 29 T.C. 1179, certiorari denied 361 U.S. 829.

(a) There is considerable merit to the Government's first position, namely, that the decedent reserved the "right" to the income from the trust—or at least up to $25,000 of income a year, which in fact was in excess of the trust's actual net income during her lifetime. To be sure, paragraph 3 of the Trust Agreement, *supra* p. 1051, the only relevant provision in this respect, is awkwardly drafted. Read literally, it seems to provide only for the trustee's distribution of *corpus* in a yearly amount which, when added to income, would equal, but not exceed, $25,000, but to be distributed only if, in the trustee's discretion, such amount is deemed necessary for the grantor's "health, welfare and happiness" considering all income that she may have from other sources. Despite the admitted absence of explicit language in respect of the distribution of income, it is fairly arguable that paragraph 3 contemplates the nondiscretionary distribution of all of the income, and that the loose discretionary standards set forth therein are pertinent only to the trustee's authority to invade corpus. This reading of paragraph 3 draws support from the gift tax return (prepared by Mr. Paul's law firm which also drafted the Trust Agreement) in which the measure of the donated property is reduced by the donor's retained life estate therein—a computation that could have been justified only by the understanding that the decedent had reserved a "right" to the income from the transferred property.

More important, however, this conclusion remains unchanged even if the distribution of the income as well as the invasion of the corpus is subject to the discretionary standards of paragraph 3. That discretion is phrased in part in terms of the "happiness" of the grantor. But "happiness is essentially a subjective matter and must be left to an honest determination of the [grantor]."

*Commissioner v. Merchants Nat. Bank of Boston*, 132 F. 2d 483, 486 (1st Cir.), affirmed 320 U.S. 256; cf. *Henslee v. Union Planters Bank*, 335 U.S. 595. Accordingly, in a case in which the trustees were to make payments of income or principal to the grantor as they "deem necessary for her comfort, support and/or happiness," this Court has held *(Estate of Carolyn Peck Boardman*, 20 T.C. 871, 874):

Obviously, the word "happiness" offered no basis upon which the trustees could have withheld any income of the trust which the decedent might have desired during her life. * * * The decedent, as grantor, effectively and intentionally retained the right to the income for her life or for a period which in fact did not end before her death. The trustees had to account to her and could not resist her demand for the income, as necessary to her happiness, under the provisions of the trust even though it was not all necessary for her comfort and support.

Petitioners have relied upon *In re Uhl's Estate*, 241 F. 2d 867 (7th Cir.), reversing 25 T.C. 22, as depriving the *Boardman* case of precedential value. However, in our view, there is no inconsistency between the cases,[3] and we know of no reason why *Boardman* should not be accepted as good law.

To be sure, as argued by petitioners, it was the trustee that was given the discretion under the Trust Agreement to make distributions to the grantor. But it was *her* happiness, a *subjective matter,* that the trustee in turn was required to take into account. And since there were no ascertainable limits to her subjective wants or "happiness," the trustee, under *Boardman,* would have been required to make payments (at least of income) to her upon her asserted demand that they were essential to her "happiness." To have failed to do so would, in our judgment, have been a breach of trust. This, it may well be stated, is tantamount to a "right" to the income.

Thus, there is strong support for the Government's first contention relating to the decedent's reserved "right" to income. But we need not rest our conclusion on this ground alone, for, in our opinion, the decedent clearly retained the "enjoyment" of the transferred property within the meaning of section 2036(a)(1). This is the Government's second contention, which we now proceed to consider.

(b) There is no doubt that the receipt of income from transferred property—particularly income-producing property—may

---

[3] The narrow scope of *Uhl* is further indicated in *Skinner's Estate v. United States*, 316 F. 2d 517, 519-520 n. 3 (3d Cir.).

constitute the "enjoyment" thereof. Cf. *Commissioner v. Estate of Church*, 335 U.S. 632, 645; *Commissioner v. Estate of Holmes*, 326 U.S. 480, 486. The mere fact of receiving all the income from property previously transferred, though, does not of itself trigger the operation of section 2036(a)(1); there must have been a reservation of such enjoyment. *Estate of Marie J. Nicol*, 56 T.C. 179, 182; *Estate of Roy D. Barlow*, 55 T.C. 666, 670. However, it is not necessary that the reservation be expressed in the instrument of transfer or even that it be legally enforceable. The statute also applies where the enjoyment has been retained pursuant to a contemporaneous arrangement or understanding in connection with or incident to the transfer. *Estate of McCabe v. United States*, 475 F. 2d 1142, 1146 (Ct. Cl.); *McNichol's Estate v. Commissioner*, 265 F.2d 667, 670-671 (3d Cir.); see also *Estate of Harry H. Beckwith*, 55 T.C. 242, 247; cf. *Estate of Ethel R. Kerdolff*, 57 T.C. 643, 648; *Estate of Emil Linderme, Sr.*, 52 T.C. 305, 308. In the circumstances of this case, the inference of such a contemporaneous understanding or arrangement whereby decedent was to receive the trust income is irresistible. Cf. *Estate of McCabe v. United States, supra; Skinner's Estate v. United States*, 316 F. 2d 517, 520 (3d Cir.), affirming 197 F. Supp. 726, 729-730 (E.D. Pa.).

We do not take seriously petitioners' contention that they have rebutted the inference of such a prearrangement or understanding by evidence that the decedent had never discussed distributions or the trust instrument with the bank and that the bank was not even aware of the trust when she signed the agreement. The point is that the agreement did not become effective until it was executed by the bank and that it was at that time that the decedent's son-in-law, *acting on her behalf*, had discussions with the head of the bank's trust department and an understanding was obviously reached regarding the administration of the trust. The bank made no independent investigation to determine the decedent's needs, and it was clearly as a result of the discussions with Mr. Paul that it was determined to make distributions to her at the rate of $6,000 a quarter. The income from the transferred securities fell far short of that amount at that time (the net income during the first full year of the trust's existence was only $8,988.72), and it was plainly understood that all of the income plus a portion of corpus would be distributed to the grantor. To be sure, the bulk of the

trust corpus consisted of the low-yield Avon Products stock which the trustee could theoretically have sold and then reinvested the proceeds in higher income-producing securities. But the trustee in fact retained the greater portion of the Avon Products stock, obviously as a result of an understanding with Mr. Paul with a view to taking advantage of its capital appreciation potential at the expense of reduced current income—a policy the wisdom of which at least up to the time of the grantor's death was amply confirmed by the substantial enhancement in value of that stock.

Although the evidence is rather meager as to the decedent's standard of living, we are satisfied on the record that the objective of distributing $6,000 a quarter to her that was agreed to by Mr. Paul and the head of the bank's trust department reasonably approximated her needs at that time in addition to what must have been a relatively small amount of income from her retained assets. And in view of the fact that she parted with approximately 85 percent of all her assets by the creation of the trust, it seems highly unlikely that she would have done so without some understanding that she would receive at least the comparatively modest income generated by the transferred securities plus a portion of the corpus as well. The existence of such understanding is supported at least in part by the fact that throughout the remainder of her life the decedent actually received all of the income of the trust.[4]

The conclusion that there was an understanding to distribute all of the income to the grantor is further supported by the gift tax return filed in connection with the creation of the trust. In that return the amount of the taxable gift was determined by subtracting $144,427.56 as the "Value of Life Estate retained by Donor." Surely, such action must have been based on something more than a mere hope that the trustee would distribute the net income of the trust to the decedent. We do not find persuasive

---

[4] This is certainly true if the total income and total distributions of the trust over the entire span of the remainder of the grantor's life are taken into account in the aggregate. See table, *supra* p. 1054. It is also unquestionably true for each full year (1967-70, inclusive) of the trust's existence considered separately. And, although the matter may be open to some dispute, we think it is also true for the final period of some 10 months of the decedent's life in 1971. The trust's net income for the *entire* calendar year 1971 was either $23,546.64 or $22,590.34, depending upon the manner in which intangible taxes are taken into account. For the first 10 months of that year the decedent received distributions of $2,000 each month, or a total of $20,000. She was thus receiving distributions at a rate that was somewhat in excess of the entire 1971 net income of the trust, however computed.

petitioner's contention that by reason of her poor eyesight the decedent did not read the gift tax return before signing it. Here again, the point is that her son-in-law, Mr. Paul, was acting on her behalf. It was his law firm, under his supervision, that prepared the Trust Agreement as well as the gift tax return. And we have no doubt that it was well understood that the income from the trust corpus would be distributed to the decedent.

This case is similar to and even stronger than *Skinner's Estate v. United States,* 316 F. 2d 517 (3d Cir.), affirming 197 F. Supp. 726 (E.D. Pa.), where a like conclusion was reached. There the decedent-grantor had created a trust ostensibly giving the trustee discretion to distribute the income to a number of beneficiaries including herself. She thereafter filed a gift tax return in which she attempted to exclude the value of her retained life interest. She actually received all of the income for the remainder of her life. The Court of Appeals approved the finding of the District Court that notwithstanding the discretionary character of the trust instrument there was an oral understanding, inferred from the evidence, that the income would be distributed to the grantor, and it accordingly affirmed the decision that the property transferred in trust was includable in the grantor's gross estate.[5] The Court of Appeals summarized the supporting evidence as follows (316 F. 2d at 520):

> The court below made a finding of fact, based on an inference drawn from the circumstances set out immediately below. The circumstances referred to were that Mrs. Skinner thought she had retained a life estate when she created the trust and demonstrated this when she filed her gift tax return for the year 1936, and that she actually did receive the income from the trust for life. The trial judge concluded that the income to Mrs. Skinner had resulted because of a "prearrangement" between her and her trustees to effect that result. * * *

Likewise here, the circumstances surrounding the creation of the trust and its subsequent administration point to the single conclusion that the parties involved had reached an understanding that decedent was to receive the income from the trust. We conclude that by virtue of this understanding with the bank, incident to the transfer of her property to the trust, decedent in fact received the entire income of the trust property for the remainder of her life and thereby retained the

---

[5] The statutory provisions there involved were contained in sec. 811(c)(1)(B)(i) of the 1939 Code, which are comparable to the provisions of sec. 2036(a)(1) of the 1954 Code involved herein.

"enjoyment" of the property within the meaning and intent of section 2036(a)(1).

Petitioners have made an alternative contention that, even if the Court were to decide that section 2036(a)(1) is applicable here, the amount includable in the decedent's gross estate should be no more than $417,000, the approximate amount of capital required to produce $25,000 a year at a 6-percent rate of return. We think there is no merit to the argument. Whatever ground there may be in other circumstances for making an allocation based upon such computations, it has no applicability here. Section 2036(a)(1) speaks of the inclusion in the gross estate of the value of the transferred "property" in respect of which the decedent retained the "enjoyment" for life. There is no dispute that such "property" is valued as of the date of death. And in this case the decedent in fact received the income from the entire "property" (which became the corpus of the trust) and thus had the "enjoyment" thereof for the remainder of her life. There is no occasion in these circumstances to proceed on the assumption that the "property" referred to in section 2036(a)(1) was a sum of money equal to $417,000, or any other amount that was different from the corpus of the trust actually created by the decedent and "enjoyed" by her until her death.

2. *The joint savings account.*—On June 29, 1967, more than 4 years before her death, decedent opened a joint savings account in her own name and that of her daughter, and she deposited $15,000 of her own money in the account. Several months later she gave her daughter exclusive possession of the passbook. At issue is whether Virginia Paul's withdrawal of the funds remaining in the account on April 26, 1971, some 6 months prior to her mother's death and after her mother had been confined to a nursing home due to cancer, constituted a transfer in contemplation of death within the meaning of section 2035, I.R.C. 1954.[6] On the authority of *Harley A. Wilson,* 56 T.C. 579, acq. in result only 1972-1 C.B. 2, we hold that it did not.

In *Wilson,* the decedent opened a joint bank account in her own name and that of her daughter. She handed the passbook to her daughter, telling her that she could use the money and enjoy it.

---

[6] SEC. 2035. TRANSACTIONS IN CONTEMPLATION OF DEATH.

(a) GENERAL RULE.—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, in contemplation of his death.

The daughter kept the passbook at her own home. She withdrew the balance in the account 10 days prior to the decedent's death, which occurred some 18 or 19 months after the account was opened. The Court held that although the gift was not completed until the date of withdrawal, the decedent's motive must be viewed as of the time the daughter's name was added to the account and the passbook given to her.

Thus, if, in accordance with *Wilson,* the state of mind of the decedent in this case as of October 1967, is pivotal, we are reasonably satisfied that she had no such apprehension of death at that time as to make applicable the contemplation of death provisions of section 2035. She was then leading an active life, and was about to purchase a condominium apartment for herself. There was reason to believe that the cancerous growth that had been previously removed would not recur, and the decedent did not appear to have any anxiety in that connection. The amount of the gift represented only a comparatively small part of her total assets, and the situation in respect of this passbook is to be sharply contrasted with that of another passbook for a joint account of the decedent and Virginia which the decedent had not turned over to her.

In view of the fact that the decedent continued to have the right to make withdrawals from the joint account after 1967 and that concededly the gift could therefore not be regarded as having been completed until Virginia closed out the account in 1971 (cf. *Estate of Sanford v. Commissioner,* 308 U.S. 39),[7] we do not feel comfortable about relying upon the decedent's state of mind as of 1967 rather than as of 1971, particularly in the light of the result reached in *Estate of Harold W. Grant,* 1 T.C. 731. Nevertheless, we think that *Wilson* requires us to do so, and the Government has not asked us to reexamine that case or its implications. Instead, it argues that *Wilson* is distinguishable. We think it cannot be fairly distinguished and in the circumstances it must be held to be controlling. Cf. *Estate of Louis Zaiger,* 64 T.C. 927, in which *Wilson* was relied upon. Accordingly, viewing the

---

[7] The incomplete character of the original gift is emphasized by the fact that the decedent thereafter received and reported the interest on the bank account. However, the $8,000 withdrawal from the account on behalf of the decedent for use as a downpayment on a condominium loses much of its significance by reason of the circumstances that it was made with Virginia's consent.

transfer as of October 1967, it is our best judgment that it was not made in contemplation of death, and we so hold.

*Decision will be entered under Rule 155.*