ESTATE OF JOHN A. Mc CAMMON, DECEASED, ELSIE L. Mc CAMMON, EXECUTRIX, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
ESTATE OF Mc CAMMON v. COMMISSIONER
Docket No. 13633-78.
United States Tax Court
T.C. Memo 1980-327; 1980 Tax Ct. Memo LEXIS 257; 40 T.C.M. (CCH) 1028; August 20, 1980, Filed *257 In 1965, decedent and his wife opened up a joint savings account, the funds for which were provided by decedent. On March 26, 1974, decedent's wife withdrew all the funds from the account and deposited them in a savings account in her name alone, in a transaction which constituted a gift, for Federal gift tax purposes. Decedent died on March 25, 1975. Held: The above-described transfer was not made in contemplation of decedent's death. Sec. 2035, I.R.C. 1954(pre-1977). Maury M. Tepper, for the petitioner. Nancy B. Herbert, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined a deficiency in Federal estate tax against petitioner in the amount of $15,350.74. After settlement of several issues, the issue remaining for decision [1] is whether funds withdrawn by decedent's wife from a joint savings account established by decedent and his wife with decedent's funds are includible in the value of decedent's gross estate under section 2035. [2] *258 FINDINGS OF FACT Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference. Elsie L. McCammon (hereinafter sometimes referred to as "Elsie") is petitioner's executrix. When the petition in this case was filed, Elsie's principal residence was in Cincinnati, Ohio. Decedent, John A. McCammon, died on March 25, 1975; he was born on November 15, 1894. Elsie is decedent's surviving spouse and the sole beneficiary of his estate. In 1964, Elsie discovered $78,000 in cash which decedent had placed in a shoe box in their residence. On February 4, 1965, this money was placed in a savings account at the *259 Madison Building Association (hereinafter referred to as "the first Madison account"). The first Madison account was in the name of Elsie or decedent with the provision "either may draw--balance at death of either payable to survivor." Decedent provided all of the funds placed in the first Madison account. No further deposits were made to the first Madison account; however, close to $40,000 in interest was added to it. All the withdrawals were made by Elsie--$3,000 on August 4, 1966, a total of $3,065.50 on July 31, 1967, a total of $2,892.98 on August 4, 1969, and $5,108 on March 26, 1973. [3]
On March 26, 1974, Elsie withdrew all the funds from the first Madison account ($103,602.74) and deposited the entire amount into a savings account in her name alone at the Madison Building Association (hereinafter referred to as "the second Madison account"). This transfer of funds constituted for Federal gift tax purposes a gift from decedent to Elsie. Other than this transfer, decedent made no taxable gifts and decedent never filed any Federal gift tax returns. *260 In 1964, decedent was hospitalized because of a stomach hernia condition. Surgery was performed. Subsequently, decedent occasionally went to a doctor for flu shots or similar minor matters. Apart from this occasion and such minor matters, decedent had no apparent health problems during the last 20 years or so of his life, until August 31, 1974. Decedent's will was executed on August 16, 1974. The will provided that Elsie was the sole beneficiary of decedent's estate. During decedent's 20 years of marriage to Elsie, the subject of a will was never mentioned by him to her before he suggested having the August 16, 1974, will prepared. Apparently this was the only will decedent ever made. It was decedent's own idea to have a will prepared. At the time the will was executed, decedent's physical and mental conditions appeared to Elsie to be all right. Decedent was hospitalized on August 31, 1974, for a possible stroke and was discharged on September 5, 1974. At the time of his admission to the hospital on August 31, 1974, and at the time of his release, Dr. R. K. Lancaster (hereinafter referred to as "Lancaster"), the physician treating decedent, diagnosed decedent's condition. *261 Lancaster's diagnosis on admission stated that decedent had cerebral vascular insufficiency, transient cerebral ischemia, [4] and chronic hardening of the arteries. The diagnosis included a report that decedent stated he was becoming more confused and forgetful, which the diagnosis attributed to his age. The diagnosis described decedent's lungs as clear, heart as grossly normal with regular sinus rhythm, and reflexes as grossly normal; it was accompanied by a report describing decedent's brain scan as normal. After this illness, decedent appeared to his friends to have recovered. At the end of 1974, decedent's physical condition appeared to his friends to be good. However, from August 31, 1974, onward until his death, decedent suffered from gradual mental deterioration. Elsie was aware of this gradual mental deterioration. On March 11, 1975, decedent passed out at home and was hospitalized. There was a question as to whether he had suffered a stroke. Lancaster discussed with Elsie the advisability of transferring decedent to a nursing home. Decedent was transferred *262 from the hospital to a nursing home on March 19, 1975, but was readmitted to the hospital on March 22, 1975, apparently with pneumonia. On March 25, 1975, decedent died of pneumonia. Elsie's 1964 discovery of $78,000 in cash in a shoe box was made during decedent's hernia hospitalization. This money was in hundred-dollar bills with rubber bands around them, in an old shoe box among some old rubbish and boxes on the floor of the clothes cupboard. When decedent returned from the hospital, Elsie insisted that this money be placed in a bank, where the money could draw interest. She feared that if the house burned down or if a burglar entered the house, the money would be lost. She was afraid decedent would give it away as he had given away other money. Decedent acquiesced, and it was this money that was deposited in the first Madison account. Decedent kept stock certificates rolled up and thrown in a drawer. Later he kept the stock certificates and the deed to the house in the glove compartment of his car, which was parked outside the house, unlocked. On one occasion $100,000 that decedent had in the Town and Country Bank in Moline disappeared; that is, Elsie never knew what *263 decedent did with it. Money from property decedent sold similarly disappeared. Decedent burned his receipts. His explanation to Elsie was that if someone came into the house the receipts would be the first things to be stolen. On one occasion decedent went into the meat market which his friend owned, and asked his friend to store a package wrapped in newspaper for safe keeping; his friend, thinking it was fish or some other perishable, put the package in the freezer. On a later date, decedent asked for the package and opened it up; it contained at least $50,000 in hundred-dollar bills. Decedent bought much more meat from the market than would be needed for two people; the owner of the market suspected decedent gave the meat to tenants in his rental property. At some time before March 26, 1974, Elsie found a gift box in a dresser drawer in which there were stacks of hundred-dollar bills wrapped in rubber bands. She said nothing to decedent, but every so often she checked that the money was still there. On one occasion the box was gone when Elsie looked. She asked decedent where the money was, and he denied knowledge of the money. He then demanded the bank book for the first *264 Madison account, but Elsie refused to give it to him. He told Elsie he did not need the bank book because he was a good friend of the manager at the Madison Building Association. Elsie then transferred the money from the first Madison account to the second Madison account; she did so in order to keep decedent from disposing of the money. OPINION The parties appear to agree that Elsie's March 26, 1974, withdrawal of $103,602.74 [5] from the first Madison account and her deposit of that sum in the second Madison account constitute a transfer by decedent on that date, within the meaning of section 2035. They also agree that Elsie's motives are significant in determining whether decedent is to be treated as having made the transfer in contemplation of his death. Petitioner maintains that the transfer was for life motives, not associated *265 with decedent's death. Respondent asserts that the transfer was made in contemplation of decedent's death. We agree with petitioner. Section 2035[6] *266 requires inclusion in the value of the gross estate of the value of all property which the decedent transferred in contemplation of death. Transfers made during the three-year period ending with the date of decedent's death are deemed to have been made in contemplation of death, unless the contrary is shown. Previous cases have suggested that the contemplation-of-death question in joint account cases may depend on the motivations of the decedent or the transferee, at the time the money was deposited in the *267 joint account or at the time it was withdrawn. See Haneke v. United States, 548 F.2d 1138 (CA4 1977); Estate of Green v. Commissioner, 64 T.C. 1049 (1975); Estate of Zaiger v. Commissioner, 64 T.C. 927 (1975); Wilson v. Commissioner, 56 T.C. 579 (1971). We need not determine which approach is the most appropriate, for all routes on this record lead to the same result. The record establishes that the first Madison account was created for purposes not connected with contemplation of death. It was created ten years before decedent's death. Elsie insisted that the money she had found in the shoe box be placed in a bank to earn interest and to be protected against casualty or theft. Decedent acquiesced to her insistence, and although he may not have had much concern about the safekeeping of cash and the earning of interest, there is no question that he did not act in contemplation of his death. The record shows that when Elsie made the withdrawal from the first Madison account, decedent was preoccupied with preventing her from doing so. He had demanded the bank book, and had told Elsie that he could obtain the money without the bank book. He wanted the money and contemplated possession *268 of it; he was not contemplating death. He had not yet made a will. He was in normal health and mentally alert. The circumstances surrounding Elsie's withdrawal of the money from the first Madison account present decedent as a man very much alive and intending to so continue. Elsie's motives at the time she transferred the funds from the first Madison account to the second Madison account were not associated with contemplation of decedent's death. Elsie intended to protect the money by making it impossible for decedent to squander it. Decedent presented the risk of squandering the money only if he were alive; Elsie's perception that there was a risk that decedent would squander the money was inconsistent with thoughts of his death. Respondent argues that the circumstances surrounding the withdrawal indicate that it was made in contemplation of death. Respondent sets forth the following circumstances as determinative: decedent's age, decedent's poor health, the proportion of decedent's estate transferred, Elsie's relationship (natural object of bounty) to decedent, decedent's lack of an established gift-making policy, and decedent's lack of desire to escape the burden of managing *269 the property. It is not clear whether respondent is suggesting that the foregoing factors substantially affected decedent's own motives on March 26, 1974. If these factors were significant in creating in decedent a desire to make a substantial gift to Elsie on that date, then either (1) decedent was an accomplished actor or (2) Elsie's testimony at the trial herein bore little relation to the truth. On this record we have no reason to doubt Elsie's testimony, the thrust of which was corroborated by the other witnesses. Also, we have no reason to believe that decedent took such great care to build up his role as a fiscal eccentric that he fooled so completely his wife of (then) nineteen years, as well as his friend. If we take respondent's brief as a suggestion that decedent's age and health, and the other matters set forth supra, affected Elsie's thinking, then we reach the same conclusion as before. Elsie's concern about preventing the funds from being squandered by decedent was founded on the assumption that decedent would have health and length of days to do the squandering. Also, respondent makes too much of the evidence that the health problems that came to light on August *270 31, 1974, must have been evidence earlier. It may be that the mental deterioration had prompted decedent's desire to have a will prepared, earlier that month. However, nothing in the record before us suggests that any such deterioration was evident to either Elsie or decedent more than five months earlier, by March 26, 1974, when the transfer at issue was made. Petitioner has presented sufficient evidence to overcome the presumptions attaching to respondent's determination and set forth in section 2035(b), no matter at which point in time or whose motives we examine. Accordingly, we conclude that the funds withdrawn by Elsie from the first Madison account are not includible in the value of decedent's gross estate under section 2035. On the one issue before us, we hold for petitioner. To reflect concessions by petitioner on other issues, Decision will be entered under Rule 155. Footnotes
1. Another issue, the amount of the marital deduction, is solely derivative in nature; its computation depends on resolution of the issue to be decided the the settled issues. ↩
2. Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect as of decedent's death. In the notice of deficiency, respondent determined that the proceeds of the account are includible under sections 2031, 2033, 2035, and 2036. At trial and on brief, respondent appears to have abandoned reliance on sections 2031, 2033, and 2036 and so the applicability of these three sections will not be considered in this opinion. See Estate of Fusz v. Commissioner,46 T.C. 214, 215↩, n. 2 (1966).
3. Respondent does not assert that the amount of this March 26, 1973, withdrawal is includible in the value of the gross estate.↩
4. Transient cerebral ischemia is loss of blood supply to the cerebrum for short, but intermittent, periods of time.↩
5. In the notice of deficiency, respondent determined that $107,840.99 was includible in the value of the gross estate on account of the transfer here at issue. Subsequently, the parties stipulated that the maximum amount so includible is $103,602.74, the amount Elsie withdrew from the first Madison account and deposited into the second Madison account.↩
6. Section 2035, as in effect at decedent's death, provided in relevant part as follows: SEC. 2035. TRANSACTIONS IN CONTEMPLATION OF DEATH. (a) General Rule.--The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, in contemplation of his death. (b) Application of General Rule.--If the decedent within a period of 3 years ending with the date of his death (except in case of a bona fide sale for an adequate and full consideration in money or money's worth) transferred an interest in property, * * * such transfer * * * shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this section * * *; but no such transfer * * * made before such 3-year period shall be treated as having been made in contemplation of death. [These provisions were amended by section 2001(a)(5) of the Tax Reform Act of 1976 (Pub. L. 94-455, 90 Stat. 1848), generally to include in the value of the gross estate the value of property which the decedent transferred within 3 years before death, whether or not the property was transferred in contemplation of death. Under section 2001(d)(1) of the 1976 Act, this amendment applies to transfers made after December 31, 1976. Clarifying amendments by section 702(f) of the Revenue Act of 1978 (Pub. L. 95-600, 92 Stat. 2930), and section 107(a)(2)(F) of the Technical Corrections Act of 1979 (Pub. L. 96-222, 94 Stat. 223) have the same effective dates. As a result, these amendments do not apply to the instant case.]↩