ESTATE OF FLOYD G. PAXTON, JERRE PAXTON, PERSONAL REPRESENTATIVE; F.G. PAXTON FAMILY ORGANIZATION TRUST, JERRE PAXTON, TRUSTEE; INTERNATIONAL DEVELOPMENT TRUST, JERRE PAXTON, TRUSTEE, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5044-82, 17718-83, Filed April 28, 1986. 17728-83

---

[1] The following cases are consolidated herewith: International Development Trust, Dale Leach, Lorne House, James D. Shrader, Ted L. Paxton, Jerre Paxton, Trustees, docket No. 17728-83, and F.G. Paxton Family Organization Trust, Diane Irwin, Lorne House, James D. Shrader, Ted L. Paxton, Jerre Paxton, Trustees, docket No. 17729-83.

*Leon C. Misterek, George M. Hartung, Meade Emory*, and *Woolvin Patten*, for the petitioners.

*Wayne R. Appleman* and *Peter R. Hochman*, for the respondent.

FEATHERSTON, *Judge*: Respondent determined a deficiency in the amount of $11,738,717 in the estate tax for the estate of Floyd G. Paxton and an addition to tax under section 6651(a)(1)[2] in the amount of $2,934,679. Also, respondent determined that the trustees of two trusts, the F.G. Paxton Family Organization Trust and the International Development Trust, are liable as transferees for the estate tax and additions to tax under sections 6324 and 6901.

The following issues have been severed for separate trial and decision:

(1) Whether the gross estate of Floyd G. Paxton includes, under sections 2033, 2036, 2037, or 2038, certain property with respect to which he transferred legal title to the F.G. Paxton Family Organization Trust and to the International Development Trust.

[2] All section references are to the Internal Revenue Code of 1954 as amended, unless otherwise noted.

2. Whether petitioners' failure to file an estate tax return was due to reasonable cause and not willful neglect within the meaning of section 6651(a).

FINDINGS OF FACT

## 1. *General*

Floyd G. Paxton (hereinafter Mr. Paxton or decedent) died on December 10, 1975. His son, Jerre Paxton (Jerre), qualified in the Superior Court of Yakima County, Washington, as personal representative of decedent's estate. Jerre was a legal resident of Washington when the petitions were filed.

During his lifetime, decedent created two trusts, the F.G. Paxton Family Organization Trust (PFO) and the International Development Trust (IDT), to which he conveyed legal title to most of his property. The principal office of each of these trusts and the legal residence of each of the individuals designated as trustees of the trusts were in the State of Washington when the petitions in these cases were filed.

Decedent was born on March 7, 1918, in Redlands, California, and was married to Eleanor Leighy (Eleanor Paxton) on March 7, 1936. They had four children:

| Name | Date of birth |
| --- | --- |
| Jerre Paxton | Nov. 24, 1938 |
| Ted Paxton | Sept. 26, 1940 |
| Floyd G. Paxton, Jr | Feb. 23, 1950 |
| Cheryl Paxton | Mar. 14, 1952 |

In 1954, decedent and Eleanor were divorced, and he moved from California to the State of Washington. In July 1954, decedent married Grace Douglas (Grace Paxton). At that time, Grace Paxton, who was born on July 19, 1916, had a teenage daughter named "Diane," who later married Jere Irwin. Decedent and Grace had one child, a son named "Ande Paxton," who was born December 7, 1956.

## 2. *Kwik Lok and Subsidiaries*

On November 12, 1954, decedent and Kenneth and Dorothy Paxton organized a corporation named Kwik Lok Corp. of Yakima (Kwik Lok). By early 1965, all of the corporation's outstanding stock was held in the name of

decedent. Kwik Lok was engaged in the business of manufacturing, selling, and distributing packaging products such as closures for plastic bags and containers, closure labels, and equipment for applying them.

Decedent also participated in the organization of Kwik Lok Corp. of Indiana (Kwik Lok Indiana) in 1960 and Paxton Industries, Inc., in 1962. Kwik Lok Indiana operated a plant, similar to that of Kwik Lok, and it serviced the eastern part of the United States. Paxton Industries, Inc., produced the plastic sheets from which plastic closures were made. Kwik Lok held all of the stock of Kwik Lok Indiana except 3 shares which were held by decedent prior to August 1967. Decedent held all of the stock in Paxton Industries, Inc., up to that date.

Decedent was president of Kwik Lok until March 31, 1968, and was chairman of the board of directors from August 3, 1967, until his death on December 10, 1975. Jerre, who had worked for the company for several years and had become vice president on July 6, 1965, succeeded to the presidency of Kwik Lok on March 31, 1968; he held that position at his father's death. Decedent was also president of Kwik Lok Indiana and Paxton Industries, Inc., until March 1968, and thereafter was chairman of the board of directors of both companies until his death.

On April 30, 1965, Mr. Paxton entered into a license agreement with Kwik Lok whereby he granted to Kwik Lok exclusive license under three patents, held in his name, related to packaging closure devices. The license was to expire on January 5, 1982, the date of the expiration of the patents. As consideration for the license, Kwik Lok was to pay Mr. Paxton 7 1/2 percent of the first $1 million in net sales, 6 percent of the second $1 million in net sales, and 5 percent of all net sales in excess of $2 million during each calendar year of the agreement, the first year to start May 1, 1965. The agreement called for minimum royalties of $10,000 for the first year, $15,000 for the second year, and $20,000 for each year thereafter. On April 11, 1969, Mr. Paxton and Kwik Lok executed a supplementary agreement whereby it was agreed that, if Mr. Paxton should die prior to January 5, 1982, Kwik Lok's liability for further royalty payments would cease. As consideration for this supplemen-

tary agreement, Kwik Lok agreed to pay Mr. Paxton $25,000.

In November 1966, decedent was hospitalized and at that time had advanced arteriosclerosis, and he was advised by a physician that he would require specific therapy and possibly bypass surgery for that ailment. Thereafter, however, Mr. Paxton was active in politics. He ran for Congress in 1966, 1970, 1972, and 1974. During this period, he also served as one of 20 members of the National Council of the John Birch Society.

### 3. *The F.G. Paxton Family Organization (PFO) Trust*

On August 3, 1967, decedent, as grantor and creator, and Lorne House (officer/employee of Kwik Lok) and Jerre, as acceptors and trustees, signed a document entitled "Declaration of Trust of this Constitutional Trust to Be Administered by Natural Persons, Holding Title in Joint Tenancy, Acting under their Constitutional Rights as Citizens of the United States of America," providing for the formation of the F.G. Paxton Family Organization (PFO). The trustees agreed to accept the conveyances in trust of certain properties for the uses and purposes set forth in the instrument. As consideration for the conveyance in trust, the trustees simultaneously issued 5,000 "Certificates of Interest to evidence the equitable interest contributing to the Trust Estate."[3]

The certificate of interest forms, attached to the declaration of trust, contained the following:

---

[3]The declaration of trust provided:

FIFTH: Ownership of Certificates of Interest in the Trust shall not entitle the holder thereof, whether or not registered, to any legal title in or to the Trust Estate nor to any undivided interest therein, nor any voice in the management of the Trust, nor to permit or entitle any heir or legal representative of a holder of any Certificate of Interest following his death to demand any partition or division of the property of the Trust or to any special accounting. Death, insolvency or bankruptcy of any holder of a Certificate or Certificates of Interest or the transfer of any Certificate or Certificates of Interest by sale, gift, devise or descent shall not operate as a dissolution of the Trust or in any manner affect the Trust, the operation or mode of business of the Trust or the Trust Estate. The Trustees may, in their sole discretion, at any time and from time to time, make any distribution of income from the operation of the Trust Estate and make any distribution of all or any portion of the assets comprising the Trust Estate for any reason to the holders of Certificates of Interest in the Trust and, except to the extent that the Trustees have given notice of their intention to make any distribution of income or of assets comprising any portion of the Trust Estate, the holders of Certificates of Interest shall have no right, title or interest in or to any portion of the Trust Estate or of any income generated by the Trust Estate for any purpose whatsoever.

The units represented hereby are nonassessable, nontaxable and negotiable as described in the Declaration of Trust which exempts both the trustees and the holders of Certificates of Interest from personal liability for debts or obligations, contractual or tortious, beyond the assets comprising the Trust Estate. This Certificate and the units represented hereby convey no interest of any kind in the properties comprising the Trust Estate and no voice or power or authority of any kind in the management or control thereof or in the management or the control of the Trustees.

Benefits hereby conveyed consist solely of such emoluments as may be determined to be distributed by the actions of the Trustees and nothing more. The units, as represented by this Certificate, are transferable in accordance with the Declaration of Trust on file in the office of Secretary of the Trustees. At the death of the holder hereof this Certificate is null, void and of no force and effect, and no heirs or legal representatives of any deceased holder hereof shall have any right to any property of the Trust or to demand any partition or division of the property of the Trust or to any special accounting.

The trust was to continue for 20 years, unless earlier terminated by the trustees, but the trustees were authorized, at the expiration of the trust, to "renew this agreement for a like or shorter period." If closed at an earlier date the Declaration of Trust provided that "The Trust shall be proportionately and in a pro rata manner distributed to the beneficiaries." The management of the trust was centralized exclusively in the trustees.

Decedent and Mrs. Paxton conveyed title of the following assets to PFO:

1. The family residence including the furniture in each room of the house;
2. 395 shares of Class A and 1,147 shares of Class B of Kwik Lok stock;
3. 3 shares of Kwik Lok Indiana stock;
4. 5 shares of Paxton Industries, Inc., stock;
5. 125 shares of Pacific Reserve Life Insurance Co. stock;
6. 200 shares of Landmark Engineering, Inc., stock;
7. 20 shares of Yakima Valley Turf Club, Inc., stock;
8. U.S. Patent No. 3,067,534; and
9. A note executed by decedent and Grace Paxton payable to PFO in the amount of $8,500 on or before October 1, 1972.

On October 30, 1967, decedent and Grace Paxton signed a lease whereby they leased the family residence for a period

of 60 months, with a right of renewal, for a rental of $500 per month.

Jerre and his wife, Nancy, Ted L. Paxton and his wife, Sharon, and Philip Crawford, Jr., an employee of Kwik Lok, and his wife, Wanda, conveyed title of the following assets to PFO:

| | |
|---|---|
| Jerre and Nancy Paxton . . . . . . . . . . . | 53 shares of Class A and 169 shares of Class B of Kwik Lok stock |
| Ted and Sharon Paxton . . . . . . . . . . . . | 53 shares of Class A and 135 shares of Class B of Kwik Lok stock |
| Philip and Wanda Crawford . . . . . . . . | 20 shares of Class B of Kwik Lok stock |

As consideration for the foregoing transfers of property to it, the trustees of PFO issued certificates of interest as follows:

| Holder | Number of units | Percentage |
|---|---|---|
| Decedent | 2,159.5 | 43.19 |
| Grace Paxton | 2,159.5 | 43.19 |
| Jerre Paxton | 192.0 | 3.84 |
| Nancy Paxton | 192.0 | 3.84 |
| Ted Paxton | 129.5 | 2.59 |
| Sharon Paxton | 129.5 | 2.59 |
| Philip Crawford, Jr. | 19.0 | 0.038 |
| Wanda Crawford | 19.0 | 0.038 |

On March 15, 1971, decedent and Grace Paxton transferred 303 units of the certificates of interest in PFO each to decedent's four children by Eleanor Paxton, to Ande Paxton, and to Diane Irwin. Thereafter and until decedent's death, the certificates were held as follows:

| Holder | Number of units | Percentage |
|---|---|---|
| Floyd G. Paxton | 1,250.5 | 25.01 |
| Grace Paxton | 1,250.5 | 25.01 |
| Jerre Paxton | 495 | 9.90 |
| Nancy Paxton | 192 | 3.84 |
| Ted Paxton | 432.5 | 8.65 |
| Sharon Paxton | 129.5 | 2.59 |
| Philip Crawford, Jr. | 19 | 0.038 |
| Wanda Crawford | 19 | 0.038 |
| Floyd G. Paxton, Jr. | 303 | 6.06 |
| Ande Paxton | 303 | 6.06 |
| Cheryl Paxton | 303 | 6.06 |
| Diane Irwin | 303 | 6.06 |

On October 28, 1976, the certificates representing 1,250.5

units held by decedent at his death were reissued to the following persons:

| Name | Units |
|---|---|
| Jerre Paxton | 856.5 |
| Nancy Paxton | 39.0 |
| Ted Paxton | 69.5 |
| Sharon Paxton | 39.5 |
| Floyd Paxton, Jr. | 61.0 |
| Cheryl Paxton | 61.0 |
| Ande Paxton | 63.0 |
| Diane Irwin | 61.0 |

At the first meeting of the PFO trustees, on August 4, 1967, Jerre was appointed "First Trustee and Trust Manager." As such he was authorized—

to handle individually all the affairs and business of the trust estate, to make distributions of portions and proceeds and income of the trust in his sole discretion, * * * to appoint his successor as First Trustee, and to preside at meetings of the Board of Trustees. No official action by the trust may be taken without his consent.

Jerre remained in this position from the date of his appointment to the date of the trial.

On October 11, 1967, three additional trustees of PFO were named, and the trustees adopted the following resolution:

RESOLVED, that because of the possibility of death, or inability for any reason of the hereinbefore named First Trustee, Jerre Paxton, to serve as such, successor First Trustees are hereby appointed as follows: First succeeding First Trustee shall be Ted Paxton; Second succeeding First Trustee shall be Floyd G. Paxton, Jr.; Third succeeding First Trustee shall be Ande D. Paxton.

At that time, neither Ted Paxton, Floyd G. Paxton, Jr., nor Ande D. Paxton was a trustee.

Jerre and Lorne House were the only trustees from August 4 to October 10, 1967. From October 10, 1967, to December 15, 1975, PFO's trustees were as follows:

| | |
|---|---|
| Oct. 10, 1967, to Sept. 19, 1969 | Jerre Paxton |
| | Lorne House |
| | Diane Irwin |
| | Donald Tait |
| | Donald Loudon |
| Sept. 19, 1969, to Nov. 20, 1969 | Jerre Paxton |

|                              |               |
| ---------------------------- | ------------- |
|                              | Lorne House   |
|                              | Diane Irwin   |
|                              | Robert Glaspey|
|                              | James Schrader|
| Nov. 20, 1969, to Oct. 30, 1975 | Jerre Paxton  |
|                              | Lorne House   |
|                              | Diane Irwin   |
|                              | James Shrader |
| Oct. 30, 1975, to Dec. 15, 1975 | Jerre Paxton  |
|                              | Lorne House   |
|                              | James Shrader |
|                              | Diane Irwin   |
|                              | Ted Paxton    |

Jerre Paxton, Lorne House, and Diane Irwin have been identified above. Donald Tait was a corporate officer of Jefferson Publications, a corporation owned and controlled by decedent. Donald Loudon was a corporate officer of Kwik Lok. Robert Glaspey was a business acquaintance of decedent. James Shrader was a certified public accountant retained by decedent for both personal and corporate accounting services.

The trust minutes reflect that the declaration of trust was amended on October 25, 1969, and again on May 27, 1972 (1972 version). The 1972 version of the declaration of trust restated many of the terms of the original declaration. The preamble contains the following paragraph:

> WHEREAS, the Subscribers intend that the functions of this Trust shall therefore be to manage and operate as effectively as possible all properties with which the Trustees may from time to time be vested so as to maximize the economic potential thereof for the good of all beneficiaries, to make grants and donations to educational, scientific and religious institutions for and in the name of the Trust, and, if the Trustees in their sole discretion so determine, to make distributions from the net revenues of such operations to the account of and in the name of the Holders of Certificates of Interest.

The trustees, as in the original instrument, accepted the conveyances of assets in trust and obligated themselves to conserve and improve the trust and to protect and preserve its assets. The declaration recites that in consideration for the transfer of assets to the trust, the trustees agreed to issue "Certificates of Interest to evidence the equitable interest contributing to the Trust Estate." The certificates

"shall only be negotiable with the express prior consent of the Trustees." The form of the certificates of interest was not changed.

The trustees were authorized to decline to approve the transfer of any certificate of interest and to purchase for the trust "from the then holder * * * at such price as the Board of Trustees in their sole and arbitrary discretion shall determine, regardless of market values, book values or other criteria for fair value." All rights of the registered holder "shall cease and terminate forthwith upon the death of the registered holder and the units represented by any such Certificate of Interest shall not pass by Will or by the laws of intestacy." The trustees, however, "may, in their sole discretion, reissue, for such consideration as the Board of Trustees may determine, the units represented by any such Certificate of Interest to such person or persons as they may determine." The instrument further provides:

In the event that a registered holder of a Certificate of Interest shall cease to have and own any portion or all of any rights he may have under any such Certificate of Interest by reason of foreclosure, insolvency or other similar creditor's proceedings, then, for all purposes hereof, any such Certificate of Interest shall be null and void and of no force, effect, or value, and the units represented by any such Certificate of Interest shall be deemed to have been acquired by purchase by this Trust and shall be cancelled and not outstanding and never reissued. No holder of any Certificate of Interest shall have any right or power whatsoever to direct or otherwise influence the Trustees in the exercise of their sole discretion. No registered holder of any Certificate of Interest shall have any right or power to alienate ownership of any Certificate of Interest or of the units represented thereby in any manner, whether by assignment, mortgage, pledge, testamentary document or otherwise, without the prior written consent of the Board of Trustees of this Trust.

The instrument states that the "Trustees shall collectively act by virtue of the covenants herein contained as a Board of Trustees" and specifies that:

The action of the majority of the whole number of Trustees expressed from time to time at a meeting or in writing with or without a meeting shall constitute the action of the Trustees and have the same effect as taken though by all.

No trustee may be removed by holders of the certificates of interest but any trustee may be removed by a majority vote at a meeting of the trustees, "but only for cause" and after

notice of the proposed removal.[4]

Consistent with the earlier versions, the instrument provides that the trust shall have a life of 20 years unless the trustees unanimously determine upon an earlier or later date. The 1972 version provides that upon dissolution and winding up of the affairs of the trust, the assets shall be distributed exclusively to one or more charitable organizations that would qualify under section 501(c)(3). The instrument further provides, however, that at any time prior to the expiration of the trust, the trustees may, if they so desire and believe that the trust should not be closed, renew the trust instrument for an additional period or periods not to exceed 20 years from the date of renewal.

On October 15, 1982, after Mr. Paxton's death, the trustees of PFO instituted in the Superior Court of Washington for Yakima County an action for declaratory judgment with respect to the administration of PFO. On October 21, 1983, the court entered a declaratory judgment:

1. That the original trust instruments and 1972 version are declared valid;

2. That "distributions of the income and corpus of PFT [PFO] need not be made to every holder of its Certificates of Beneficial Interest and need not be made pro rata in proportion to the number of units of interest represented by each certificate and held by the distributees at the time of such distributions."

3. That, on termination of the trust, its corpus and accumulated income is to be distributed to a tax-exempt organization described in section 501(c)(3) selected by the trustees;

4. That the trustees have "power and authority" in their discretion to distribute "income and/or corpus to any holder of a unit of beneficial interest without regard to distributions to other such holders"; to extend or renew the trust "for additional periods or terms of 20 years, or less," and to

---

[4]The declaration of trust provides:

"No Trustee shall be removable from office by the holders of Certificates of Interest for any reason at any time whatsoever. Any Trustee may be removed as such, but only for cause, upon the vote in favor of such removal of the majority of the remainder of the Trustees at the time in office at a meeting of the Trustees held not sooner than thirty (30) days following the actual delivery of notice of such proposed removal to the person so proposed to be removed as Trustee, which notice shall be accompanied by a detailed written list of particulars alleged to form the basis for the proposed removal."

amend the trust subject to the limitation that the trust may not be amended "to adversely affect or jeopardize the interests of the charitable beneficiary remainders."

The following table reflects the income, expenses, and distributions made by PFO from 1968 to 1976:[5]

| Year | Rents and royalties | Dividends | Interest | Gross income | Taxable income | Distributions to beneficiaries |
|------|--------------------|-----------|----------|--------------|----------------|-------------------------------|
| 1968 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1969 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1970 | $7,000 | 0 | 0 | $7,000.00 | 0 | 0 |
| 1971 | 6,000 | $20,420 | 0 | 26,420.00 | $11,609.56 | $7,000 |
| 1972 | 9,000 | 0 | $1,705.71 | 10,705.71 | 0 | 0 |
| 1973 | 3,000 | 23,652 | 219.46 | 26,871.46 | 5,095.66 | 1,000 |
| 1974 | 6,000 | 0 | 0 | 6,000.00 | 0 | 1,500 |
| 1975 | 9,000 | 0 | 0 | 9,000.00 | 0 | 2,000 |
| 1976 | 3,000 | 4,928 | 29.00 | 7,957.00 | 0 | 0 |

## 4. *The International Development Trust*

On July 10, 1968, decedent and Grace Paxton as subscribers, grantors, and assignors executed a declaration of trust providing for the creation of the International Development Trust (IDT). On July 11, 1968, by action of the trustees—

Jerre Paxton was appointed as First Trustee to handle individually all the affairs and business of the trust estate, to make distributions of portions and proceeds and income of the Trust in his sole discretion, the right to appoint his successor as First Trustee, and to preside at meetings of the Board of Trustees. No official action by the Trust may be taken without his consent.

The trustees also resolved that if for—

good and proper reason conformable to their duties under this indenture, the Trustees may cancel the Certificates of Interest outstanding in return for the pro rata distribution of the corpus then standing in the Trust.

The declaration of trust provided that "By unanimous action, the Trustees may amend from time to time the trust

---

[5]Apart from the dividends received in 1971, 1973, and 1976, PFO had only small amounts of income other than the rental payments for the Paxton family residence. On its fiduciary returns, PFO claimed deductions with respect to the residence for repairs, insurance, and depreciation; capitalized the costs of household furnishings, sprinkler system, lawn mower, driveway, refrigerator, and kitchen remodeling as additions to basis for depreciation purposes, and carried forward net operating losses so computed.

document." The trust minutes reflect that the IDT declaration of trust was amended on January 18, 1973, and on February 16, 1976. In all material respects, the 1973 version of the IDT declaration of trust was similar to the May 30, 1972, version of the PFO declaration of trust described above.

To this trust decedent and Grace Paxton on July 12, 1968, transferred in trust certain foreign and U.S. patents in exchange for 100 units of certificates of interest. On August 7, 1968, 50 units of certificates of interest, originally issued to decedent and Grace Paxton, were reissued so that the units of interest of IDT were held until decedent's death as follows:

| Holder | Number of units | Percentage |
|--------|-----------------|------------|
| Floyd Paxton | 25 | 25 |
| Grace Paxton | 25 | 25 |
| Jerre Paxton | 10 | 10 |
| Ted Paxton | 8 | 8 |
| Cheryl Paxton | 8 | 8 |
| Ande Paxton | 8 | 8 |
| Diane Irwin | 8 | 8 |
| Floyd G. Paxton, Jr. | 8 | 8 |
| | 100 | 100 |

On October 28, 1976, 19 of the 25 units of the IDT certificates of interest held by Floyd Paxton prior to his death were reissued to certain family members so that the certificates of interest were then held as follows:

| Name | Units | Percentage |
|------|-------|------------|
| Grace Paxton | 25 | 26.04 |
| Jerre Paxton | 18 | 18.75 |
| Ted Paxton | 9 | 9.38 |
| Cheryl Paxton | 10 | 10.41 |
| Ande Paxton | 10 | 10.42 |
| Diane Irwin | 10 | 10.42 |
| Floyd G. Paxton, Jr. | 10 | 10.42 |
| Sharon Paxton | 2 | 2.08 |
| Nancy Paxton | 2 | 2.08 |

The trustees of IDT were as follows:

July 10, 1968, to Sept. 10, 1968 . . . . . . . . . . . . . . . . . . . . . . . Jerre Paxton
Lorne House
Sept. 10, 1968, to Oct. 31,1975 . . . . . . . . . . . . . . . . . . . . . . . Jerre Paxton

|                                        | Lorne House   |
|                                        | James Shrader |
|                                        | Dale Leach    |
|                                        | Peter Lind    |
| Oct. 31, 1975, to Dec. 15, 1975 ...... | Jerre Paxton  |
|                                        | Lorne House   |
|                                        | James Shrader |
|                                        | Dale Leach    |
|                                        | Ted Paxton    |

All of these individuals have been identified above except Dale Leach, who was an employee of Kwik Lok, and Peter Lind, an attorney for Mr. Paxton and Kwik Lok.

The table on page 799 reflects IDT's distributions to the holders of its certificates of beneficial interest.

In each of its fiscal years 1981 through 1984, IDT made substantial distributions of trust corpus to certificate holders and charitable organizations, as reflected in the trust's annual financial statements and the following table:

| Fiscal year | Net income (or loss) | Distributions |
|-------------|----------------------|---------------|
| 1981        | $92,314.18           | $107,500      |
| 1982        | 6,004.92             | 101,000       |
| 1983        | (10,780.07)          | 91,000        |
| 1984        | (56,325.61)          | 109,500       |

## 5. *Income and Gift Tax Returns*

No gift tax returns were filed by either Floyd G. Paxton or Grace Paxton in connection with the transfers of the assets to PFO or IDT or the transfers of the certificates of interest in PFO or IDT to other family members. In letters addressed to the Internal Revenue Service protesting the proposed gift tax deficiency, decedent and Grace Paxton asserted, among other things, that no gift tax deficiency was due because they received for the transferred property "something which * * * [they] felt was of equal value."

On his individual Federal income tax returns for the years 1965 through 1975, Mr. Paxton reported income from various sources, including wages, consulting fees, and interest, as well as distributions from the PFO and IDT trusts. However, the bulk of decedent's income during those years was derived from his patent licensing agreement with Kwik Lok.

| Tax year | Total | Floyd G. Paxton, Sr. | Grace Paxton | Jerre Paxton | Ted Paxton | Floyd G. Paxton, Jr. | Cheryl Paxton | Ande Paxton | Gregg Paxton | Diane Irwin | Nancy Paxton | Sharon Paxton |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6/30/69 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6/30/70 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6/30/71 | $6,000 | $1,250 | $1,250 | $1,500 | $400 | $400 | $400 | $400 | 0 | $400 | 0 | 0 |
| 6/30/72 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6/30/73 | 4,100 | 300 | 300 | 2,000 | 300 | 300 | 300 | 300 | 0 | 300 | 0 | 0 |
| 6/30/74 | 6,000 | 500 | 500 | 2,500 | 500 | 500 | 500 | 500 | 0 | 500 | 0 | 0 |
| 6/30/75 | 16,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 0 | 2,000 | 0 | 0 |
| 6/30/76 | 41,000 | 0 | 18,500 | 6,000 | 2,500 | 2,500 | 2,500 | 6,500 | 0 | 2,500 | 0 | 0 |
| 6/30/77 | 75,500 | 0 | 49,500 | 10,000 | 1,000 | 0 | 1,000 | 10,000 | $1,000 | 1,000 | $1,000 | $1,000 |
| 6/30/78 | 63,000 | 0 | 43,000 | 4,000 | 1,000 | 1,000 | 1,000 | 10,000 | 0 | 1,000 | 1,000 | 1,000 |

On the fiduciary income tax returns filed for PFO and IDT, distributions to the holders of the certificates of interest were shown as "Deductions for distributions to beneficiaries."

For the period from October 1, 1967, to December 31, 1967, the Commissioner of Internal Revenue determined that decedent and Grace Paxton were taxable under sections 676 and 677, the grantor trust provisions, on 86.38 percent of PF0's net income because they granted a nonadverse party a power to revoke the trust. The resulting income tax deficiencies were sustained, *Paxton v. Commissioner*, 57 T.C. 627 (1972), affd. 520 F.2d 923 (9th Cir. 1975). For 1969, 1970, and 1971, the Commissioner determined that decedent and Mrs. Paxton were taxable on the net income of PFO and IDT because they retained the power to revest in themselves title to the corpus of the trusts (or portions thereof) as well as the power to apply or distribute the income of their trusts for their benefit, referring to sections 676 and 677. The deficiencies as to PFO were sustained but, because of differences in the language of the trust instruments, were not upheld as to IDT. *Estate of Paxton v. Commissioner*, T.C. Memo. 1982-464.

## 6. *Addition to Tax for Failure To File an Estate Tax Return*

An Amended Inventory for decedent's estate was filed on July 15, 1980, in the Superior Court of the State of Washington for Yakima County listing the following assets as a true inventory of all the property in decedent's estate:[6]

| | |
|---|---|
| Real property, Lot 28, Tampico Park, Yakima County, Washington | $3,500 |
| Cash (bank account) | 20,000 |
| 20,000 oz. silver bullion | 70,000 |
| Personal effects | 2,000 |
| | 95,500 |

Peter Lind, a Washington attorney who served as tax advisor to the Paxton family from 1967 to the time of trial, advised Jerre that the value of the assets in decedent's community estate did not exceed $60,000 and that he need

---

[6]The initial inventory filed Nov. 16, 1976, contained no schedule of assets, and the first amended inventory filed Feb. 16, 1977, included only 10,000 ounces of silver bullion valued at $35,000.

not file an estate tax return. Consistent with that advice, Jerre did not file an estate tax return for the estate.

## OPINION

The trust instruments on which these cases turn follow the format and employ much of the language used in so-called family trusts which in recent years have been the subject of numerous income tax cases.[7] We are here dealing, however, with an asserted estate tax liability. The PFO and IDT declarations of trust differ from typical family trust instruments in that they do not involve personal service income but have as their subject matter highly valuable stock, patents, and other property. Although the language in the declarations of trust is so ambiguous and in some respects internally inconsistent as to be almost unintelligible, we have the task of attempting to ascertain the relationships created by those instruments and applying pertinent provisions of the estate tax laws to decedent's transfers to the trusts.

Our task in interpreting the ambiguous trust instruments has not been made easier by the numerous alternative (and at least to some extent inconsistent) positions advanced by respondent—that the transferred assets were includable in decedent's gross estate under sections 2033 (on the grounds that the trusts were shams, invalid under estate law, or resulting trusts), 2036, 2037, and 2038. Respondent has accompanied his arguments with repeated expressions of concern about the potential abuses of the family trust concept in the gift and estate tax fields. Petitioners in this

---

[7]In such cases, the trusts have been denied income tax effect on the grounds that the trusts were shams, *Holman v. United States*, 728 F.2d 462, 465 (10th Cir. 1984); cf. *Zmuda v. Commissioner*, 731 F.2d 1417, 1421 (9th Cir. 1984), affg. 79 T.C. 714 (1982); were grantor trusts under secs. 671 to 677, *Vnuk v. Commissioner*, 621 F.2d 1318, 1321 (8th Cir. 1980), affg. a Memorandum Opinion of this Court; *Hanson v. Commissioner*, 696 F.2d 1232, 1234 (9th Cir. 1983), affg. a Memorandum Opinion of this Court; or involved assignments of income, *Vnuk v. Commissioner*, 621 F.2d at 1320; *Hanson v. Commissioner*, 696 F.2d at 1234. In *United States v. Buttorff*, 761 F.2d 1056 (5th Cir. 1985), a promoter was enjoined from selling pure equity or family trust packages. The PFO trust involved in the instant case was held to be a grantor trust under secs. 676 and 677 in *Paxton v. Commissioner*, 520 F.2d 923 (9th Cir. 1975), affg. 57 T.C. 627 (1972). The Court of Appeals (at page 927 n. 5) commented on the trust instrument as follows:

"In the briefs and at argument, we have been urged to recognize that the F.G. Paxton Family Organization is unique, unusual, and unconventional in its structure as well as its operation. Certainly it is unusual to find a trust instrument title 'Declaration of Trust of this Constitutional Trust.' " * * *

case and Mr. Paxton prior to his death, on the other hand, have shifted their positions as to the meaning and consequences of the trust instruments, depending upon the tax in controversy and the arguments which they are attempting to refute.[8] The trust declarations have also been amended repeatedly, apparently to deal with current or anticipated tax problems. The result is that neither party has provided the Court with an analysis of the trust instruments containing a consistent thread of interpretation.

### 1. *The Controlling Declarations of Trust*

The parties do not even agree on what version of the trust instruments controls as to PFO: the August 3, 1967, the October 25, 1969, or the 1972 version of the declaration of trust. This disagreement is attributable, in part, to the absence of a provision in the August 3, 1967, PFO declaration of trust authorizing the trustees to amend it. Such a provision does appear in the July 10, 1968, IDT trust declaration.

We have concluded that petitioners' estate tax liability should be determined under the 1972 version of the PFO instrument and will treat it as the controlling PFO trust declaration. The 1972 version was signed by Mr. Paxton as grantor and by the then trustees as such, and was acquiesced in by the then holders of all the certificates of interest. These individuals were the only ones interested in the trust as creators, administrators, or beneficiaries except potential section 501(c)(3) organizations under the October 25, 1969, version of the trust.[9] In the Yakima County

---

[8]As examples, petitioners argue that the trustees held their legal title for the "exclusive benefit" of Jerre. Yet petitioners' requested findings refer to the certificates of interest as units of "beneficial ownership." In response to a proposed gift tax deficiency, Mr. Paxton and Grace Paxton on Jan. 23, 1975, addressed separate letters to the District Director stating that no gifts were made when they transferred property to PFO and IDT because the certificates of interest had value equal to such property; yet, in this proceeding, they contend the certificates of interest conferred no rights and had no value because Jerre was given absolute control over the trust assets. As to petitioners' contention that Jerre was given the exclusive beneficial interests in the two trusts, see the discussion in the text, *infra*.

[9]The provision regarding distributions to a sec. 501(c)(3) organization on termination of the PFO trust first appeared in the Oct. 25, 1969, version. The PFO trustees, according to the minutes of a Sept. 26, 1967, meeting, authorized the creation of the F.G. Paxton Family Foundation as a sec. 501(c)(3) organization. The record does not show whether the foundation was ever activated. In view of the unrestricted powers of the PFO trustees to distribute its income and corpus to the holders of certificates of interest and to extend the life of PFO indefinitely, the provisions requiring the transfer of the assets to a charitable organization on termination of the trust was, as a practical matter, illusory.

Superior Court declaratory judgment proceeding, the Attorney General of the State of Washington was named as one of the defendants in his capacity as statutory representative of unnamed charities with contingent interests, and the Superior Court held that the 1972 version was valid. In *Paxton v. Commissioner*, T.C. Memo. 1982-464, this Court held that the 1972 version was not valid because the August 3, 1967, version did not give the trustees power to amend the instrument. That decision was reached, however, before the Superior Court judgment was obtained.[10]

We have also decided, in applying the PFO instrument, to give effect to the declaratory judgment entered by the Superior Court of Yakima County, Washington, on October 21, 1983, interpreting the PFO instrument. We recognize that, under *Commissioner v. Estate of Bosch*, 387 U.S. 456, 465 (1967), we should give proper regard to, but we are not bound by, that court's judgment; in the absence of a Washington State Supreme Court decision, we are to apply what we find to be the State law on the subject. Neither party, however, has cited nor have we found any State law inconsistent with the Yakima County Superior Court judgment. Also, because we hold for respondent and the State court decree appears to reflect the interpretation most favorable to petitioners, we adopt that view in order to foreclose further disputes as to the effect of various provisions in the trust instruments.[11]

---

[10]We think too much water has gone over the dam to permit adoption of respondent's arguments that the trusts were shams and were invalid under State law and that resulting trusts arose. We refer to such matters as the 18 and 17 years of existence of the two trusts, respectively; the two income tax cases in which both parties assumed that the trusts were valid under State law(*Paxton v. Commissioner*, 520 F.2d 923 (9th Cir. 1975), affg. 57 T.C. 627 (1972); *Paxton v. Commissioner*, T.C. Memo. 1982-464); the reshuffling of Mr. Paxton's certificates of interest before and after his death and the subsequent distributions; and the State court decree referred to in the text.

[11]The State court judgment interpreting the 1972 version of the PFO declaration of trust has some curious aspects. The proceeding that led to the judgment was evidently filed, at least in part, to support petitioners' position in the instant cases. The complaint, filed Oct. 15, 1982, alleges an existing controversy and "until such uncertainty is settled, plaintiffs [the trustees] cannot properly perform their duties as trustees of PFT [PFO]." Nowhere in either the complaint or the court's findings, however, is there any reference to a Feb. 16, 1976, version of the PFO trust declaration, executed shortly after decedent's death, which was then in effect. In fact, in an interrogatory served by the State of Washington, Jerre Paxton was asked whether the provisions in the 1972 version authorizing the trustees to amend the instrument have been utilized and, without mentioning the 1976 version, he indicated that it had not.

## 2. *Decedent's Interest as Beneficiary of the Trusts*

As we read the PFO and IDT declarations of trust and related instruments, they created discretionary trusts subject to certain retained interests discussed below.[12] Decedent and Grace Paxton transferred property to the trustees of PFO and IDT, respectively, and the trustees accepted the property as trust assets for which they assumed fiduciary responsibilities. As consideration for the transfers, decedent and Grace Paxton, and others who transferred Kwik Lok stock to the trusts, received beneficial interests in the trusts evidenced by certificates of interest. The trust declarations expressly provide that the certificates of interest "evidence the equitable interest contributing to the Trust Estate." The PFO trustees, as explained by the Yakima County Superior Court, were given discretion to distribute both income and corpus to the certificate holders and the distributions were not required to be proportionate to the holdings of such certificates.[13] In our view, the certificate holders, including decedent, were, thus, the beneficiaries of the trusts.[14]

Petitioners, however, contend that "Jerre Paxton received an outright conveyance and assignment of the complete beneficial interest in the assets designated as trust assets." Petitioners argue:

---

[12]A discretionary trust is one in which "by the terms of a trust it is provided that the trustee shall pay to or apply for a beneficiary only so much of the income and principal or either as the trustee in his uncontrolled discretion shall see fit to pay or apply." 1 Restatement, Trusts 2d, sec. 155(1) (1959).

[13]The fact that the trustees were given discretion as to the distribution of income, or corpus, or both to the holders of certificates of interest does not mean that the trustees' powers were free of control of a court. A court may take appropriate action, such as holding the trustee liable, setting aside a transaction, or removing a trustee, in case of an abuse of discretion, fraud, or bad faith, dishonesty, misconduct or arbitrariness, or want of ordinary skill and judgment. See 1 Restatement, Trusts 2d, sec. 187 and comments; 3 A. Scott, Trusts, sec. 187, at 1503 n. 3 (3d ed. 1967); *Peoples National Bank of Wash. in Seattle v. Jarvis*, 58 Wash. 2d 627, 364 P.2d 436 (1961); *Occidental Life Ins. Co. of Cal. v. Blume*, 65 Wash. 2d 643, 399 P.2d 76 (1965).

[14]If we are incorrect in our view that the holders of the certificates of interest were the beneficiaries of the trusts, there were no identifiable beneficiaries of the trusts. In those circumstances, respondent's alternative position that the trusts were invalid is correct. "Where an express trust fails because of the want of a named beneficiary, a resulting trust arises in favor of the donor," and the transfers are includable in decedent's estate under sec. 2033. *Union Trust Co. of Pittsburgh v. McCaughn*, 24 F.2d 459, 462 (E.D. Pa. 1927). See also G. Bogert, Trusts & Trustees, sec. 468 (2d rev. ed. 1979); *In re Williams' Estate*, 167 Wash. 524, 10 P.2d 219, 223 (1932); *In re Long's Estate*, 190 Wash. 196, 67 P.2d 331, 332 (1937) ("The law requires the beneficiary of a testator to be pointed out with certainty.")

Absolutely no evidence of any circumstance could be introduced to raise an inference that Floyd Paxton did not intend Jerre Paxton to have the beneficial interest in the property. The entire record, beginning with Floyd's conveyance of the assets to Jerre and to Lorne House, his patently subservient trustee, with unlimited powers to amend the trust instrument; the disclaimer in both the certificates and trust instruments of any enforceable beneficial interest to be enjoyed by their holders, despite their precatory connotations; the manner in which Jerre Paxton ran the trusts and their assets with an iron hand; and concluding with Floyd Paxton's Last Will * * * in which he made provision for the disposition of only his automobile, wearing apparel, jewelry, cash and other personal effects, irrefutably demonstrates that Jerre Paxton was intended to have the entire beneficial interest in the assets transferred. Lorne House and such additional or successor co-trustees as he might have, received and would hold their legal title for the exclusive benefit of Jerre Paxton, subject to only such largess as he might deign to bestow upon his family members or others.

This argument is without merit. It is inconsistent with Mr. Paxton's argument to the Internal Revenue Service in January 1975 that he owed no gift tax on the transfers to the trust because, he asserted, the "property was transferred to the trusts in exchange for certificates of beneficial interest in the trusts." It is inconsistent with the whole thrust of *Paxton v. Commissioner*, 520 F.2d 923 (9th Cir. 1975), affg. 57 T.C. 627 (1972), where the court held that Jerre's then ownership of 3.84 percent of the PFO certificates of interest was insufficient to make him a trustee with an interest adverse to that of decedent and Grace Paxton under the grantor trust provisions of sections 676 and 677. It is inconsistent with the October 11, 1967, action of the PFO trustees, one of whom was Jerre Paxton, in designating Mr. Paxton's three other sons as successor first trustees with the same powers as Jerre enjoyed.[15] It is inconsistent with the elaborate provisions in both trust instruments on, and the meticulous care given to, the identification in the trust records before and after Mr. Paxton's death of the holders of the certificates of interest. Finally, it is inconsistent with both trusts' treatment in the fiduciary income tax returns of the distributions to the certificate holders as deductions for distributions to beneficiaries.

Jerre Paxton's powers with respect to the trusts were trust powers. No transfers were made to him as an

[15]A similar resolution was adopted by the IDT trustees on Aug. 3, 1983.

individual. The PFO and IDT trust instruments expressly state that the transferred property was held "upon trust for the uses and purposes hereinabove and hereinafter set forth." The minutes of the PFO trustees authorizing the issuance of the 4,319 certificates of interest "for and in consideration" of the transfer by decedent and Grace Paxton expressly state that the conveyance was made to the trustees "to hold in trust"for the benefit of the PFO trust. Decedent's offer to convey the patents to IDT states that he would "convey to you, as Trustees" for IDT. Neither one of the declarations of trust or conveyance mentions a first trustee or Jerre Paxton by name in any capacity other than as a trustee.

The record is clear that Jerre was the most influential one of the trustees and that he was designated by the other trustees as first trustee and given broad authority to manage the affairs of the trust. As a practical matter, he was in many respects the sole trustee. Again, however, his powers as first trustee were trust powers, not beneficial powers. As explained in *Paxton v. Commissioner*, 520 F.2d at 925, his powers as first trustee "are not prescribed by the trust itself and can be withdrawn by a majority of the trustees." Our findings, moreover, quote provisions of the 1972 version of the PFO trust declaration which specifically provide that decisions of the trustees were to be made by majority vote. Indeed, under those provisions, Jerre, like any one of the other trustees, could be removed by a majority vote of the other trustees after proper notice. The IDT trust instrument is similar.

Jerre's position as trustee or first trustee did not give him a beneficial interest in the trust or its corpus; his beneficial interest was measured by the number of units covered by his certificates of interest. A trustee is under a duty to administer the trust solely in the interest of the beneficiaries, and he is required to have an undivided loyalty. "The trustee is not permitted to make a profit out of the trust." *In re Johnson's Estate*, 187 Wash. 552, 60 P.2d 271, 272 (1936); *Matter of Estate of Drinkwater*, 22 Wash. App. 26, 587 P.2d 606, 608 (1978). The "trustee has no right to derive any benefit or advantage from the trust fund; but all his skill and labor in the management of it

must be directed to the advancement of the interest of his cestui que trust." *In re Carlson's Guardianship*, 162 Wash. 20, 297 P. 764, 768 (1931); *County of Skamania v. State*, 102 Wash.2d 127, 685 P.2d 576 (1984).

Making Jerre, his eldest son, first trustee so that he could control the destiny of the trusts was obviously part of decedent's plan for attempting to transmit his considerable estate to the natural objects of his bounty, while at the same time receiving income and enjoying the potential for receiving additional amounts. After decedent's death, the IDT distributions, as shown in in our findings, have substantially exceeded IDT's income with the result that the corpus of the trust is being systematically passed on to the Paxton family members. The question is whether Mr. Paxton found a way of transmitting his wealth to the Paxton children without incurring any transfer tax whatever. We do not think he did.

### 3. *Retained Life Interest: Section 2036(a)(1)*

Section 2036(a)[16] provides that the value of the gross estate shall include the value of all property transferred by trust or otherwise with respect to which the decedent has retained for his life or a period which did not in fact end before his death (1) the possession or enjoyment of, or right to income from the property, or (2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom. That section reflects a "legislative policy of subjecting to tax all property which has been the subject of an incomplete *inter vivos* transfer." *United States v. O'Malley*, 383 U.S. 627, 631 (1966).

The legislative policy is to include in a decedent's gross estate transfers which are in substance testamentary, i.e.,

---

[16]SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE.

(a) GENERAL RULE.—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death—

(1) the possession or enjoyment of, or the right to the income from, the property, or

(2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.

"transfers which leave the transferor a significant interest in or control over the property transferred during his lifetime." *United States v. Estate of Grace*, 395 U.S. 316, 320 (1969). As stated in *Commissioner v. Estate of Church*, 335 U.S. 632, 645 (1949):

an estate tax cannot be avoided by any trust transfer except by a bona fide transfer in which the settlor, absolutely, unequivocally, irrevocably, and without possible reservations, parts with all of his title and all of his possession and all of his enjoyment of the transferred property.

Section 2036(a)(1) applies if the decedent retained either the right to income from the property or its possession or enjoyment. Thus, even if a decedent does not expressly reserve a right to the income, the transferred property may be included in the decedent's gross estate under section 2036(a)(1) if the decedent retained possession or enjoyment of the property. *McNichol's Estate v. Commissioner*, 265 F.2d 667, 670-671 (3d Cir. 1959), affg. 29 T.C. 1179 (1958).

For two reasons, we hold that Mr. Paxton's transfers to the PFO and IDT trusts are includable in his gross estate under section 2036(a): (1) He made the transfers subject to an understanding, express or implied, that he would receive the trust income or corpus or both when requested, and (2) he retained an interest in the trust income and corpus his creditors could reach.

## A. *Express or Implied Understanding*

Respondent contends that, pursuant to an understanding, express or implied, decedent retained for life the possession or enjoyment of, or the right to the income from, the property transferred to the trusts and that, therefore, the trust property is includable in his estate under section 2036(a)(1). Petitioners contend that decedent made a bona fide irrevocable transfer of his property to the trusts and that he retained no rights, interest, or control over the transferred property. Petitioners have the burden of proof. *Estate of Whitt v. Commissioner*, 751 F.2d 1548, 1556 (11th Cir. 1985), affg. a Memorandum Opinion of this Court.

Had Mr. Paxton retained no rights in the entrusted property, as petitioners now contend, then the transfers would have been completed gifts and subject to gift tax

under section 2501(a). Yet the record reveals that no gift tax return was filed when the property was transferred to the trusts.[17] On January 23, 1975, not long before his death, Mr. Paxton filed with the Internal Revenue Service a letter protesting a proposed gift tax deficiency. In that letter, he stated that he did not make "donative" transfers of the property, that the "property was transferred to the trusts in exchange for certificates of beneficial interest in the trusts," that the "trust certificates * * * have consistently returned income to him," and that he exchanged "his property for something which he felt was of equal value" to him.

The parties here agree that the certificates of interest as such had virtually no value because of the broad discretion over distributions expressly conferred on the trustees. Yet Mr. Paxton's statements in the protest letter made only a few months before he died show that he knew he had not made no-strings-attached transfers to the trusts, but had received a quid pro quo which he referred to as "something which he felt was of equal value." We find that the something of equal value he received in the exchange was an understanding, express or implied, with the trustees that he would receive distributions of income or corpus if, as, and when he requested them.[18]

The effect of an express or implied understanding is addressed in section 20.2036-1(a), Estate Tax Regs., which provides:

An interest or right is treated as having been retained or reserved if at the time of the transfer there was an understanding, express or implied, that the interest or right would later be conferred.

Under section 2036(a)(1) and this regulation, a retained life interest need not be created by the express terms of the

---

[17]The gift and estate tax laws are in pari materia and must be construed together. *Estate of Sanford v. Commissioner*, 308 U.S. 39, 44 (1939). If the certificates of beneficial interest were issued as consideration for property transferred by decedent, and hence equal in value to such property (as decedent and Grace Paxton contended in protest letters regarding proposed gift tax on the transfers), the value of the certificates themselves would be includable in decedent's estate under sec. 2033.

[18]Jerre Paxton testified that distributions were made at the suggestion of one of the trustees to meet a particular need or at the request of one of the holders of a certificate of interest. He added: "I probably usually had the last word to say on that." Thus, the procedure for authorizing and making trust distributions is wholly consistent with our finding that there was an understanding that Mr. Paxton would receive distributions if, as, and when requested.

instrument, nor need it be legally enforceable, for section 2036(a)(1) to apply. *McNichol's Estate, supra* at 670-671; *Estate of Green v. Commissioner*, 64 T.C. 1049, 1061 (1975); *Estate of McCabe v. United States*, 201 Ct. Cl. 243, 250, 475 F.2d 1142, 1146 (1973). Indeed, the existence of an agreement or understanding by which the possession or enjoyment of the property is retained may be inferred from the circumstances of the transfer and the manner in which the transferred property is used. *Skinner's Estate v. United States*, 316 F.2d 517, 519-520 (3d Cir. 1963); *Estate of Barlow v. Commissioner*, 55 T.C. 666, 670 (1971).

The circumstances of the instant case reveal that Mr. Paxton was a wealthy man accustomed to living well. He transferred to the trusts all of his property, including even his household furniture,[19] except his patent licensing agreement which paid him royalties ranging from about $100,000 to some $196,000 per year until his death. Apart from these royalties and small amounts of income from consulting fees, interest, and distributions from PFO and IDT, he had no income. The royalties would cease on the expiration of the patents in 1982. At that time, decedent would have been only 64 years of age. We do not think he would have left himself virtually destitute at that age without an understanding that he would receive income or corpus or both from the trusts when and as needed. See *Estate of Green v. Commissioner*, 64 T.C. at 1062.

We also think it inconceivable he would have left his wife

---

[19]The completeness with which decedent and Mrs. Paxton stripped themselves of their household goods and furnishings is illustrated by the following list of items transferred to PFO from their living room:

    1 large sectional davenport
    1 large round marble-topped coffee table
    1 2-shelf end table; hardwood
    1 long dropleaf coffee table
    2 upholstered occasional chairs
    1 decorative brass scales
    1 large table lamp
    1 floor lamp
    1 crescent wall table and mirror
    1 mantle clock set
    1 pair large antique vases
    1 7-piece fireplace set
    1 group ceramic bowls, flower pots
    1 Hammond spinet electric organ
    1 metal organ lamp

The bill of sale to PFO includes a corresponding list of items from each room in the residence.

destitute; yet he apparently made no provision for her, other than the trusts, in the event of his death. After transferring to the trusts virtually all their property, including the family residence, decedent, on April 11, 1969, surrendered all royalty payments remaining at his death under his patent licensing agreement in exchange for $25,000. But Grace Paxton was not left destitute.[20] At decedent's death she began receiving approximately $4,000 per month from the IDT trust and has continued to live in the family residence.[21] The provisions in the trust instruments authorizing non-pro-rata distributions of income and corpus facilitated these distributions to Grace Paxton and, similarly, would have permitted disproportionate distributions to decedent if he had needed them.

Petitioners point out that trust distributions to decedent and his wife before and after decedent's death were made only at the trustees' discretion and, in any case, constituted only a small percentage of their income during decedent's lifetime.[22] However, continuous receipt of substantial

---

[20]The record reflects that Grace Paxton continued to occupy the family residence and received the following cash distributions from PFO and IDT in the fiscal years ended June 30 following Mr. Paxton's death: $18,500 in 1976; $49,500 in 1977; $43,500 in 1978; $42,000 in 1979; $50,000 in 1980; $55,500 in 1981; $59,500 in 1982; $60,500 in 1983; and $50,500 in 1984. When questioned about her continued occupancy of the family residence, she testified as follows:

Q. Has anyone ever assured you that you could continue living there, Mrs. Paxton?
A. I've never asked.
Q. You don't have any understanding regarding this?
A. Well, I just suppose I'm supposed to. I don't know.

[21]Petitioners argue that because decedent and his wife occupied the family residence under a lease agreement and paid "fair" rent to the PFO trust, sec. 2036(a)(1) is not applicable. However, we do not think the lease arrangement represents a bona fide arm's-length transaction between the parties; thus, we find that decedent reserved for his life the possession and enjoyment of the family residence. See Estate of duPont v. Commissioner, 63 T.C. 746, 764-765 (1975). Decedent and his wife continued to occupy the residence, complete with their furnishings and personal belongings, after the PFO trust was created, and Grace Paxton continued to live in the home after her husband's death. The lease term is automatically renewable each year without notice to either party and has been so renewed for 18 consecutive years. Finally, the lease provides for the payment of rent in a fixed amount which has remained unchanged up to the time of trial. Even if the fixed amount were "fair rental" in 1967, the same amount would not be fair rental over 18 years of inflation and rising expenses.

[22]Mr. Paxton, along with other holders of certificates of interest, received distributions from PFO in 1971 and from IDT in 1971, 1973, 1974, and 1975. True, the PFO distributions were less than the IDT distributions, but PFO's only income producing asset of any significance was its Kwik Lok stock. As directors of Kwik Lok, Mr. Paxton and Jerre controlled the flow of dividends to PFO. IDT had greater income than PFO, but Mr. Paxton, who was receiving large amounts of patent royalty income from Kwik Lok, did not need additional funds which, according to the testimony, was distributed only on request.

amounts of trust income is not necessary to support the finding of a prearrangement under section 2036(a)(1).[23]

In *Estate of McCabe v. United States*, 201 Ct. Cl. 243, 475 F.2d 1142 (1973), the decedent created in 1940 an inter vivos trust which provided for the income to be paid to his wife for life with a remainder to his children. The trust instrument also provided that trust corpus could be invaded for the benefit of Mrs. McCabe on her illness or in case of an emergency. No distributions from trust corpus were made until 1959 when the decedent retired and his income diminished. After decedent retired in 1959 and before he died in 1964, cash distributions were made to him at four separate times from trust corpus pursuant to letters executed by Mrs. McCabe at his request. At no time did the trustee, decedent's longtime friend and business associate, inquire as to Mrs. McCabe's situation to determine if she was ill or needed the cash for an emergency.

On these facts, the Court of Claims held that decedent retained a life interest in the trust includable in his estate under section 2036(a)(1). The court found persuasive evidence of an implied arrangement between decedent and the trustee, even though no distributions were made to decedent until he needed the cash—19 years after he created the trust.

The facts in the instant case are similar. Here, as in *McCabe*, decedent had substantial income sources aside from the property held in trust and demanded no income or corpus so long as he did not need it. However, unlike the decedent in *McCabe*, Mr. Paxton died before his income stream terminated. He never needed the cash distributions. Grace Paxton, on the other hand, left virtually penniless at her husband's death, needed distributions from the trust and began receiving them immediately after her husband's death.

In some respects, the evidence in the instant case is even stronger in support of a prearrangement than in *McCabe*.

[23]Courts have found a decedent's receipt of all the trust income for his life to be evidence of a prearrangement, *Skinner's Estate v. United States*, 316 F.2d 517, 520 (3d Cir. 1963); *Estate of Green v. Commissioner*, 64 T.C. 1049, 1963 (1975); however, such receipt is not essential to the application of sec. 2036(a)(1). *Estate of Wells v. Commissioner*, T.C. Memo. 1981-574; *Estate of McCabe v. Commissioner*, 201 Ct. Cl. 243, 251, 475 F.2d 1142, 1147 (1973); R. Stephens, G. Maxfield & S. Lind, Federal Estate and Gift Taxation, at 4-137 (5th ed. 1983).

First, decedent herein was a beneficiary of the trusts and received several distributions along with other holders of certificates of interest during the first 8 years the trusts were in effect, while the decedent in *McCabe* received no distributions for the first 19 years of the trust. Second, Mr. Paxton, in creating the trusts, was parting with virtually all he owned when his patent licensing agreement expired; he would hardly have risked giving up all his assets without making some arrangement to get some income or the property back if and when he needed it. Third, after Mr. Paxton's death, his certificates of interest were reissued to the Paxton children (including Diane Irwin) and their spouses, the natural objects of his bounty, and distributions from the IDT trust to the Paxton children and their spouses increased substantially, though not as dramatically as in the case of Grace Paxton. Finally, the record in this case reveals a close father-son relationship between decedent and his son, Jerre, who from the beginning for all intents and purposes in actual practice was the sole trustee.[24] Two months after PFO was created, decedent's three other sons, in descending order according to age, were respectively named as successor first trustee in case of Jerre's disability or death. As stated in *Skinner's Estate v. United States*, 316 F.2d at 520:

> every case of this sort must stand on its own facts, and * * * the practice of assuming that a trustee * * * is necessarily independent of the cestui whom he represents, need not be followed invariably but may be rebutted by circumstances.

Based on all of the foregoing circumstances, we think it was understood between decedent and his son, Jerre, at or before the execution of the PFO and IDT trusts, that decedent would receive distributions of income or corpus or both upon demand or at the expiration of decedent's patent licensing agreement.[25] Given the agreement of the parties

---

[24]Petitioners' brief describes Lorne House as a "patently subservient trustee." All the other trustees except Robert Glaspey, who served as a PFO trustee for 2 months in 1969, were relatives of decedent and Grace Paxton, were employees of Kwik Lok or a corporation controlled by Mr. Paxton, or were Mr. Paxton's attorney or accountant.

[25]As stated in *McNichols' Estate v. Commissioner*, 265 F.2d 667, 673 (3d Cir. 1959), affg. 29 T.C. 1179 (1958):

"when filial devotion and respect * * * justifies the faith which a parent reposes in his children in transferring property to them upon their oral assurance that the income is to be

that the certificates of interest that he received had no fair market value, we can find no other explanation for Mr. Paxton's statement that he received something of value equal to the value of the property he transferred to the trusts. Accordingly, we hold that decedent retained for his life possession or enjoyment of the property he transferred to the trusts; and, therefore, the value of the property transferred to the PFO and IDT trusts is includable in his gross estate under section 2036(a)(1).

## B. *Retention of Interest Creditors Could Reach*

As settlor-beneficiary, decedent retained the economic benefit and enjoyment of the entire trust income and corpus because he could borrow money or otherwise incur indebtedness and relegate his creditors to the trust for payment. Retention of the right to use the trust as a form of security for his indebtedness in this manner left Mr. Paxton with a significant interest in the property. See *United States v. Estate of Grace*, 395 U.S. 316, 320 (1969). In our opinion, that is sufficient to require his transfers to the trusts to be included in his gross estate under section 2036(a)(1).

The widely accepted legal principle controlling the rights of the creditors of a settlor-beneficiary of a trust in which the trustees are given discretion, not controlled by an ascertainable legal standard, to make distributions to the settlor, is stated in 1 Restatement, Trusts 2d, sec. 156(2) (1959), as follows:

Where a person creates for his own benefit a trust for support or a discretionary trust, his transferee or creditors can reach the maximum amount which the trustee under the terms of the trust could pay to him or apply for his benefit.[26]

---

his for life, it is entirely artificial to hold that the parent did not retain the enjoyment of the property until his death * * *"

[26] See also 2 A. Scott, Trusts, sec. 156.2 (3d ed. 1967). G. Bogert, Trusts and Trustees, sec. 223, at 438-439 (2d rev. ed. 1979), states:

"If a settlor creates a trust for his own benefit and inserts a spendthrift clause, it is void as far as then existing or future creditors are concerned, and they can reach his interest under the trust. Numerous cases uphold this doctrine, and many statutes assert it. [Fn. refs. omitted.]"

The omitted footnotes list the decisions of 16 State courts and the statutes of 18 States. Comment e, accompanying 1 Restatement, Trusts 2d, sec. 156 (1959), deals with discretionary trusts of the type created by Mr. Paxton as follows:

e. Discretionary trust for the settlor. Where by the terms of the trust a trustee is to pay the settlor or apply for his benefit as much of the income or principal as the trustee may in his

To permit the owner in creating a trust to retain for his own benefit an interest in the entrusted property which cannot be reached by creditors is against public policy. *Nelson v. California Trust Co.*, 33 Cal. 2d 501, 202 P.2d 1021 (1949); *In re Mogridge's Estate*, 342 Pa. 308, 20 A.2d 307, 309 (1941).

This principle has been applied in both estate and gift tax cases.[27] Where the decedent at any time during his life could have obtained the economic benefit of the trust income or corpus by borrowing and then forcing creditors to look to his interest in the trust income for a source of repayment, this interest has been held sufficient to require the inclusion of the transferred property in decedent's gross estate under section 2036(a)(1). *Estate of Uhl v. Commissioner*, 25 T.C. 22 (1955), revd. and remanded 241 F.2d 867 (7th Cir. 1957); see also *Estate of Boardman v. Commissioner*, 20 T.C. 871 (1953). In reversing the *Uhl* decision, the Court of Appeals did not directly dispute the Tax Court's view that the settlor of a trust is regarded for tax purposes as retaining any interest in the trust which his creditors can reach but concluded that under Indiana law the settlor's creditors could not have reached the trust property.[28]

Similarly, in the related gift tax area, transfers to a discretionary trust have been held to be incomplete and not subject to the gift tax where, under the applicable State law, the creditors of the settlor-beneficiary could reach the income or corpus of a discretionary trust. *Paolozzi v. Commissioner*, 23 T.C. 182, 186-187 (1954) (Massachusetts law); *Vander Weele v. Commissioner*, 27 T.C. 340, 343-344 (1956), affd. 254 F.2d 895 (6th Cir. 1958) (Michigan law); *Outwin v. Commissioner*, 76 T.C. 153, 162-165 (1981) (Massachusetts law). The principle was explained in *Vander Weele v. Commissioner*, 254 F.2d at 898, holding that no gift tax was incurred by a settlor-beneficiary of a trust, as follows:

discretion determine, his transferee or creditors can reach the maximum amount which the trustee could pay to him or apply for his benefit.

See also E. Griswold, Spendthrift Trusts, sec. 481 (2d ed. 1947).

[27]See note 18 *supra*.

[28]See Lowndes, "Some Doubts About the Use of Trusts to Avoid the Estate Tax," 47 Minn. Law Rev. 31, 36 (1962); Covey, "Power to Distribute to Grantor," 98 Trusts and Estates, 322, 325 (1959); *Estate of German v. United States*, 7 Cl. Ct. 641, 643 (1985).

The trustees were granted almost unrestricted power to invade the corpus of the trust for the benefit of the trustor, with the possibility of the repayment of the entire trust fund to her. The trust conveyance in effect created no completed taxable gift to the remaindermen—the husband and children of the trustor. There was no assurance that anything of value would pass to the remaindermen. The settlor could in actuality retain the economic benefit and enjoyment of the entire trust income and corpus of the trust estate by borrowing money or by selling, assigning, or transferring her interest in the trust fund and relegating her creditors to the trust fund for payment.

On the other hand, a gift tax has been held applicable where under State law, as interpreted by the court, the settlor-beneficiary's creditors could not reach the trust corpus or income. *Herzog v. Commissioner*, 116 F.2d 591 (2d Cir. 1941), affg. 41 B.T.A. 509 (1940) (New York law);[29] see also *Rheinstrom v. Commissioner*, 105 F.2d 642 (8th Cir. 1939), affg. on this issue 37 B.T.A. 308 (1938).

In the instant case, according to the Yakima County Superior Court, the trustees of the PFO trust could make distributions of income or corpus to the holders of certificates of interest and the distributions need not be made pro rata in proportion to the number of units of beneficial interest held by the distributees. Within their discretion, therefore, the trustees could have made distributions to Mr. Paxton, up to and including the entire trust corpus. Under Washington law, we are convinced, his creditors could have reached such amounts. Accordingly, his inter vivos transfers to the trusts are includable in his gross estate under section 2036(a)(1).

Two Washington statutes address this issue. Wash. Rev. Code Ann. sec. 6.32.250 (1977), one of the provisions dealing with exemptions from seizure, states:

---

[29]Since *Herzog v. Commissioner*, 116 F.2d 591 (2d Cir. 1941), affg. 41 B.T.A. 509 (1940), was decided, the New York courts have come to accept the Restatement rule as the law in that State. See *Vanderbilt Credit Corp. v. Chase Manhattan Bank*, 100 A.D.2d 544, 473 N.Y. Supp. 2d 242, 245-246 (1984), where the court stated:

"when a person creates for his own benefit a discretionary trust, his creditors can reach the maximum amount which the trustee under the terms of the trust *could* pay to him or apply for his benefit, even though the trustee in the exercise of his discretion wishes to pay nothing to the beneficiary or to his creditors, and even though the beneficiary could not compel the trustee to pay him anything (see *Ware v. Gulda*, 331 Mass. 68, 117 N.E.2d 137; *State Street Bank & Trust Co. v. Reiser*, 7 Mass. App. 633, 389 N.E.2d 768; *Greenwich Trust Co. v. Tyson*, 129 Conn. 211, 27 A.2d 166; Restatement, Trusts 2d, sec. 156, subd. [2]; 2 Scott, Trusts [3d ed.], sec. 156.2; contra *Herzog v. Commissioner of Internal Revenue*, 116 F.2d 591 (2nd Cir))."

Property exempt from Seizure. This chapter does not authorize the seizure of, or other interference with, * * * property held in trust for a judgment debtor where the trust has been created by, or the fund so held in trust has proceeded from, a person other than the judgment debtor * * *[30]

The Washington supreme court has stated that the "practical effect of [this] statute has been to clothe every active trust with statutory spendthrift provisions,"[31] *Seattle First Nat. Bank v. Crosby*, 42 Wash. 2d 234, 254 P.2d 732, 738 (1953), but the "other than the judgment debtor" language limits the statute to trusts created by one who is not also a beneficiary.[32] This limitation appears to be an implicit recognition of the principle of 1 Restatement, Trusts 2d, sec. 156(2) (1959), quoted above. Bogert, Trusts & Trustees, sec. 223, at 440, n. 99 (2d rev. ed. 1979). In other words, this provision does not prevent the seizure of property held for a judgment debtor in a trust created by the judgment debtor.

Wash. Rev. Code Ann. sec. 19.36.020 (1977) further provides:

Deeds, etc., in trust for grantor void as to creditors. That all deeds of gift, all conveyances, and all transfers or assignments, verbal or written, of goods, chattels or things in action, made in trust for the use of the person making the same, shall be void as against the existing or subsequent creditors of such person.

This section is in substance a statutory enactment of the Restatement rule. 2 A. Scott, Trusts, sec. 156.2 (3d ed. 1967). We think the statute means exactly what it says. Petitioners argue, however, that the section is applicable only where the property was transferred to the trust with a specific intent to defraud creditors. Petitioners argue that

---

[30]Wash. Rev. Code Ann. sec. 6.32.250 (1977) is subject to two statutory limitations: Wash. Rev. Code Ann. sec. 30.30.120 (1977), which expressly exempts from Wash. Rev. Code Ann. sec. 6.32.250 (1977) claims for furnishing "the necessities of life," claims of "support for the children under the age of eighteen of any beneficiary," and a vested remainder in the trust upon its expiration; and Wash. Rev. Code Ann. sec. 19.36.020 (1977), which states the rule that a person cannot create a spendthrift trust for himself. Wicker, "Spendthrift Trusts," 10 Gonzaga L. Rev. 1, 9 (1974); Comment, "Spendthrift Trusts in Washington—The Statutory Restraint Upon Involuntary Alienation," 58 Wash. L. Rev. 831, 836-837 (1983).

[31]A spendthrift provision provides that the interest of the beneficiary is inalienable and that creditors cannot reach the interest in satisfaction of their claims. Griswold, Spendthrift Trusts, sec. 1 (2d ed. 1947).

[32]See E. Griswold, sec. 473, at 541.

the section does not apply here because Mr. Paxton had no intention of defrauding his current or subsequent creditors.

Most of the cases in which Wash. Rev. Code Ann. sec. 19.36.020 (1977) has been applied were cases in which there was evidence of actual fraud. *Allard v. La Plain*, 152 Wash. 211, 277 P. 843 (1929); *Van Stewart v. Townsend*, 176 Wash. 311, 28 P.2d 999 (1934); *Carroll v. Carroll*, 18 Wash.2d 171, 138 P.2d 653 (1943); *Jones v. Jones*, 56 Wash.2d 328, 353 P.2d 441 (1960). However, we have found no Washington case in which the court held that fraud must be proved to invoke Wash. Rev. Code Ann. sec. 19.36.020 (1977).[33]

Nevertheless, if petitioner is correct that Wash. Rev. Code Ann. sec. 19.36.020 (1977) is limited to transfers with actual intent to defraud, and Wash. Rev. Code Ann. sec. 6.32.250 (1977), referred to above, also does not apply here because the trusts created by Mr. Paxton fall within the exception, we are then left with the common law on the rights of creditors to reach trust income and corpus where the trust was created by the debtor and the trustees have discretion to distribute income and corpus to him. We have found no cases (and petitioners have cited none) suggesting that the courts of Washington would not follow the almost universally accepted rule of 1 Restatement, Trusts 2d, sec. 156(2).[34] Accordingly, we find that because decedent's

---

[33]Comment a. on 1 Restatement, Trusts 2d, sec. 156(2) (1959), makes clear that intent to defraud is not a factor in applying the rule, as follows:

a. Intention to defraud creditors not required. The rules stated in this Section are applicable although the transfer is not a fraudulent conveyance. The interest of the settlor-beneficiary can be reached by subsequent creditors as well as by those who were creditors at the time of the creation of the trust, and it is immaterial that the settlor-beneficiary had no intention to defraud his creditors.

See also E. Griswold, sec. 473, at 540.

[34]The Court of Appeals for the Ninth Circuit in applying the Restatement rule has recognized that a "spendthrift trust" provision in Massachusetts, California, and generally, is invalid as to the creditors of the trustor. *Hughes v. Commissioner*, 104 F.2d 144, 148 (9th Cir. 1939). See also, e.g., *Matter of Goff*, 706 F.2d 574, 587 (5th Cir. 1983) (law of Texas) ("the general rule is well established"); *Liberty Nat. Bank v. Hicks*, 173 F.2d 631, 634 (D.C. Cir. 1948) ("the universal rule"); *Byrnes v. Commissioner*, 110 F.2d 294, 295 nn. 1&2 (3d Cir. 1940), revg. 39 B.T.A. 594 (1939) (law of Pennsylvania); *Vanderbilt Credit Corp. v. Chase Manhattan Bank*, 100 A.D. 544, 473 N.Y. Supp. 2d 242, 245-246 (1984); *Elec. Workers v. IBEW-NECA Holiday Trust*, 583 S.W.2d 154, 162 (Mo. 1979); *Proctor v. Woodhouse*, 127 Vt. 148, 241 A.2d 785, 790 (1968) ("prevailing authority"); *Merchants Nat. Bank of New Bedford v. Morrissey*, 329 Mass. 601, 109 N.E.2d 821, 823 (1953) ("weight of authority "); *Nelson v. California Trust Co.*, 33 Cal.2d 501, 202 P.2d 1021, 1022 (1949); *McArthur v. Faw*, 183 Tenn. 504, 193 S.W.2d 763, 768 (1946) ("well settled limitation"); *Greenwich Trust Co. v. Tyson*, 129 Conn. 211, 27 A.2d 166, 171 (1942) ("overwhelming weight of authority"); *Harrison v. City National Bank of Clinton, Iowa*, 210 F. Supp. 362 (S.D. Iowa 1962).

creditors could reach the maximum amount which, under the terms of the trust declarations, could be distributed to him, decedent's transfers to the trusts are includable in his gross estate under section 2036(a)(1).[35]

### 4. Failure To File Estate Tax Return

Section 6651(a)[36] imposes an addition to tax for the failure to file a return required by section 6018 (estate tax returns), "unless it is shown that such failure is due to reasonable cause and not due to willful neglect." As respondent does not contend that petitioners' failure to file an estate tax return was due to willful neglect, we need only decide whether, under the statute, Jerre's reliance on the advice of his attorney constituted "reasonable cause" for failure to file.

The regulations define "reasonable cause" sufficient to excuse the failure to file a return as the exercise of "ordinary business care and prudence." Sec. 301.6651-1(c)(1), Proced. & Admin. Regs. In a recent case, the Supreme Court sought to clarify the meaning of "reasonable cause" in situations where an executor relied upon legal advice in deciding not to file an estate tax return for the estate. *United States v. Boyle*, 469 U.S. 241, 105 S. Ct. 687 (1985). In *Boyle*, the executor of an estate argued that because he

---

[35]We think our conclusion is consistent with the Washington State courts' treatment of the Washington statutory scheme regarding spendthrift trusts and creditors' rights. Historically, the courts have sought to limit the broad scope of these statutes, and consequently, have often found the statutes inapplicable to the given situation and have applied instead the common law rule. *Erickson v. Bank of California, N.A.*, 97 Wash. 2d 246, 643 P.2d 670, 673 (1982) (Wash. Rev. Code Ann. sec. 30.30.120 (1977), not applicable to trusts with express spendthrift provisions); *Knettle v. Knettle*, 197 Wash. 225, 84 P.2d 996, 998 (1938) (Wash. Rev. Code Ann. sec. 6.32.250 (1977) not applicable to "passive" trusts); see also Comment, "Spendthrift Trusts in Washington—The Statutory Restraint Upon Involuntary Alienation," 58 Wash. L. Rev. 831, 846-849 (1983).

Furthermore, the court in *Erickson* concluded that Wash. Rev. Code Ann. sec. 30.30.120 (1977) was not meant to restrict the common law as it applies to spendthrift trusts, and finding that section inapplicable to express spendthrift trusts, applied 1 Restatement, Trusts 2d, sec. 157(b). We likewise have found no indication that Wash. Rev. Code Ann. secs. 6.32.250 and 19.36.020 (1977) were intended to restrict the common law of Washington.

[36]SEC. 6651. FAILURE TO FILE TAX RETURN OR TO PAY TAX.

(a) ADDITION TO THE TAX.—In case of failure—

(1) to file any return required under authority of subchapter A of chapter 61 (other than part III thereof), * * * on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate;

relied upon counsel to timely file a return for the estate, his failure to file a return was due to reasonable cause. The Court held that reliance on an agent does not excuse the failure to make a timely filing of a tax return, and stated (469 U.S. at 249-250):

> Congress has placed the burden of prompt filing on the executor, not on some agent or employee of the executor. * * * That the attorney, as the executor's agent, was expected to attend to the matter does not relieve the principal of his duty to comply with the statute. * * *

The Court distinguished, however, the case in which a taxpayer relied on the advice of his attorney that it was unnecessary to file a return at all. According to the Court, such reliance would constitute reasonable cause, even if the advice was erroneous. 469 U.S. at 250.[37] The instant one is just such a case. Jerre, as personal representative, consulted with Peter Lind, tax advisor to the Paxton family for many years, and was told that an estate tax return need not be filed for Mr. Paxton's estate. We find that Jerre's reliance on his counsel's advice that no return was necessary constituted reasonable cause for his failure to file a return, even if such advice was wrong.

As stated by the Supreme Court in *Boyle*:

> When an accountant or attorney *advises* a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice. Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a "second opinion," * * * would nullify the very purpose of seeking the advice of a presumed expert in the first place. * * * "Ordinary business care and prudence" does not demand such actions. [469 U.S. at 251. Citation omitted.]

Accordingly, petitioners are not liable for the section 6651(a) addition to tax.

*An appropriate order will be issued.*

---

[37]See also *Estate of Buring v. Commissioner*, T.C. Memo. 1985-610.